HENRY JORDAN, RESPONDENT, v. LOLA PARSONS, APPELLANT.—199 S. W. (2d) 881.

St. Louis Court of Appeals. Opinion filed February 18, 1947.

*Melvin Englehart* for appellant.

*Robert I. Meagher* for respondent.

ANDERSON, J.—This is an appeal by Lola Parsons, defendant below, from a judgment of the Circuit Court of Madison County, Missouri, enjoining her from obstructing a road which runs across her land and from interfering with the use thereof by Henry Jordan, plaintiff below, and the general public.

The appellant is the owner of 20 acres of land (W½ SE¼ NW¼ Sec. 12, Twp. 33 N, R. 6 E, Madison County, Missouri), and the respondent is the owner of 40 acres of land (SE¼ NW¼ Sec. 13, Twp. 33 N, R.6 E Madison County, Missouri). The respondent's land is one mile south of that owned by appellant. A public road known as the Dry Creek Public Road, running in a general east-west direction crosses the north end of appellant's land. The roadway involved in this action runs in a northwest-southeast direction across the southwest corner of appellant's land, and then runs in a general southern direction to and across the respondent's land, and intersects with a road running in a general northwest-southeast direction.

Respondent moved onto his land in 1935, and used the roadway across appellant's land until about March 7, 1945, when appellant closed the roadway by fencing her land. Respondent testified that the public generally used this road from the time he purchased the farm in 1935 until it was closed by appellant in 1945. Respondent also offered evidence to the effect that the road in question had been in continuous, uninterrupted use by the public since 1876, and that during said time the road had been in the same location. Some of this evidence was hearsay testimony and was admitted by the court over the objection of the appellant.

Between the lands of appellant and respondent was a tract of land known as the Dunaha farm, with the Dunaha farm house located about half way between the appellant's farm and the respondent's land.

Appellant's testimony tended to show that from 1876 to approximately 1912 or 1914, the roadway in question was in its present location from the respondent's land to the Dunaha farm, but, that at the Dunaha farm house it turned to an east and northeast direction, and that it did not follow the same course as the road in question, which continues north from the Dunaha farm house for a quarter of a mile to appellant's land, and then across the southwest corner thereof.

According to the testimony of appellant's witnesses, whenever persons had occasion to travel the road north from the land of the respondent, during the period from 1876 to 1912 or 1914, they would turn east upon reaching the Dunaha homestead if going to Fredericktown, and, if not going to Fredericktown, they would turn west over a road running in a northwest direction. Neither road passed over the appellant's lands. The road which turned west at the Dunaha house thereafter turned northwest and then north, and ran a few yards west of appellant's land until it intersected the Dry Creek Road, which ran east and west across the north end of appellant's farm.

A number of witnesses testifying on behalf of the appellant stated that prior to 1914 an orchard and a cornfield were located north of the Dunaha farm house, and that no roadway passed through this cornfield and orchard prior to that time. In 1927, Robert Wench lived

on respondent's farm. He died prior to the time of the institution of this suit. His son, Henry Wench, and a number of other witnesses, testified that all of the land north of the Dunaha homestead and south of appellant's land was in timber, and that in the summer of 1926 no roadway existed across this mile, or across appellant's land, as claimed by respondent, but that between the Fall of 1926 and the Spring of 1927, Robert Wench cleared the road through this timber, at which time the general public first began to travel across the land owned by appellant, and in this manner the roadway was established in 1927.

Witnesses offered by the respondent testified that the physical facts showed that the roadway in question across the land of the appellant evidence the fact that the road had been used for a long period of time. Witnesses for the appellant testified that the land between the Dunaha farm house and appellant's land was formerly a cultivated field, and that they had seen a fence around it showing that it had been used for cultivating crops.

Appellant complains of the reception of certain testimony on the ground that it was hearsay. The evidence complained of was testimony given by Charles Ray with respect to certain declarations made to him by his father, since deceased; and testimony given by Jesse Ballew concerning declarations made by his father and mother.

At the time of the trial, Charles Ray was 68 years old. He stated that 45 or 46 years ago he hauled lumber over the road in question, and that when he first went over the road it looked as if it had been used as a road for many years prior thereto.

The testimony objected to appears in the transcript as follows:

"Q. Do you know of any other name that the old road was referred to? A. It was referred to me when I was sixteen or seventeen years old as being one branch of the old military road traveled in 1861, 1862, 1863, 1864, and 1865. My father said he was a soldier in that Civil War.

.    .    .    .    .

"Q. State what was said of the road. A. Well, we used to raise cattle, and we were hunting for cattle back in this range. It was a free open range. We hit this old road; and I said, "Father, where does this road lead out to?" And he said, "Son, this was one branch of the old military road, and soldiers in time of the War used to travel this road a good deal down this ridge, and they hit the Twelve Mile Road"—what is called 67 now. It was called the Lone Star Route. They hit it where Ben Whitener lives, and the other end connected with the Old Dry Creek Road on the ridge.

"Q. That road that you were talking about at that time, was that same road? A. That is the same identical road that I hauled this lumber over.

"Q. And is it the same road over which Lola Parsons has put the obstruction across? A. Absolutely."

Later called for further examination, the witness testified that his father died in 1920 at the age of 74.

"Q. . . . Now, Mr: Ray, did you hear your father make any other statements about this road that crosses the defendant's land· other than what you testified to about it being a branch of the old military road? A. Well, he said it was used by the public. And at the time we came into the road, he said the road had been traveled to a great extent by people going to and from Twelve Mile country to Fredericktown.

. . . . . .

"Q. Over how long a period of time? A. He said for a number of years. He said that it was one branch of the old military road and was used by the soldiers in the time of the Civil War.

. . . . .

"Q. How long did he say the public had used it? A. Well, he didn't say just how long that the public had used it, only he said that the people on the north or west side of Twelve Mile Creek would come up that way in case of high water, when the water was up high, going to and from Fredericktown."

The testimony further shows that the witness' father lived in the community at the time of the Civil War, and that the conversations which the witness had with him occurred when the witness was fifteen or sixteen years old. The witness was born in 1876.

Jesse Ballew testified that he was sixty-nine years of age; that his father died in 1906, and his mother died in 1939. He further testified that when he was a boy; he had heard both his father and mother say that they had traveled the road in question before he was born. He was born in 1876.

In support of the claim that the evidence was admissible, the respondent invokes the benefit of the exception to the hearsay rule which makes competent the declarations of deceased persons when they relate to and are relevant to the existence of any matter of public or general interest.

Under the common law rules, such evidence is received provided the matter to be proved and the reputation offered are ancient matter, i. e., of a past generation, and provided the declaration is made *ante litem motam* by a person in a position to have acquired adequate knowlenge concerning it. [Wigmore on Evinence, 3rd Edition, Sections 1582, 1588, 1591.]

As in all exceptions to the hearsay rule, the fundamental considerations which form the basis for allowing the exception are, (1) a necessity for the evidence; and (2) a circumstantial guarantee of trustworthiness. With respect to an ancient right of a public nature, the necessity for the admission of such evidence is apparent. Unless such evidence is admitted, the litigant loses the benefit of a

valuable source of evidence, which in many cases is the only evidence available. The existence of the second consideration springs from the public nature of the subject concerning which the evidence is offered. It is developed by Wigmore on Evidence, 3rd Ed., Vol. 5, Sec. 1583, as follows:

"The element here operating to supply a fair degree of trustworthiness is . . . the consideration that the prolonged and constant exposure of a condition of things to observation and discussion by a whole community will in certain cases sift the possible errors and will bring the resulting belief down to us in a residual form of fair trustworthiness. These conditions are usually found where the matter is one which in its nature affects the common interests of a number of persons in the same locality, and thus necessarily becomes the subject of active, general, and intelligent discussion; so that whenever a single and definite concensus has been reached in the shape of common reputation, it may be supposed to have considerable evidential value."

One of the early decisions which developed the reasons for admitting such evidence is the case of Regina v. The Inhabitants of Bedfordshire, 4 Ellis & Blackburn 535. In that case the question at issue was whether the obligation to repair a bridge, called Harrold's Bridge, rested upon the public or upon certain private parties *ratione tenurae*. At the trial a witness was called, the testified that he and his deceased father before him had worked in repairing the second arch of the bridge. The witness was asked whether he had heard from his deceased father who ought to repair the second arch. An objection to this question was sustained on the ground that evidence of reputation was not admissible on the trial of this time. After a verdict for the Crown, a rule for a new trial was obtained, which, after hearing, was made absolute, the court holding that the evidence should have been admitted. Lord Campbell who delivered the opinion of the court said:

"The question which we have to determine in this case is, whether at the trial of an indictment for non-repair of a public bridge, with a plea that third persons are bound to repair the bridge, *ratione tenurae*, evidence of reputation be admissible.

"The law of England lays down the rule that, on the trial of issues of fact before a jury, hearsay evidence is to be excluded, as the jury might often be misled by it; but makes exceptions where a relaxation of the rule tends to the due investigation of truth and the attainment of justice. One of these exceptions is where the question relates to matters of public or general interest. . .. . The admissibility of the declarations of deceased persons in such cases is sanctioned, because these rights and liabilities are generally of ancient and obscure origin, and may be acted upon only at distant intervals of time; because direct proof of their existence therefor ought not to be required;

because in local matters, in .which the community are interested, all persons living in the neighborhood are likely to be conversant; because, common rights and liabilities being naturally talked of in public, what is dropped in conversation respecting them may be presumed to be true; because conflicting interests would lead to contradiction from others if the statements were false; and thus a trustworthy *reputation* may arise from the. concurrence of many parties. unconnected with each other, who are all interested in investigating the subject. But the relaxation has not been, and ought not to be extended to questions relating to matters of mere private interest;· for respecting those direct proof may be given, and no trustworthy reputation is likely to arise. We must remark, however, that although a private interest should be involved with a matter of public interest, the. reputation respecting rights and liabilities affecting classes of the community cannot be excluded, or this relaxation of the rule against the admission of hearsay evidence would often be found unavailing."

The learned judge then reviews the facts tending to show that the question at issue involved matters of public and general interest within the meaning of the exception. He then continues:

"If the question were, whether, a bridge be a public bridge, which the public have a right to use and the county is bound to repair, there seems to be no doubt that evidence of reputation would be admissible; and there seems no reason for following a different course where the question is, whether the county or an individual is bound to repair. Here the private liability of the individual comes in; but the question of the liability of the county remains."

The court concludes that the evidence was improperly rejected, although the question involved a matter of private right as well as public interest.

A leading case in this country is Inhabitants of Enfield v. Woods, 212 Mass. 547, 99 N. E. 331. In that case suit was brought by the town of Enfield, as owner of the fee in a lot called the "Common," to enjoin defendant, who claimed to own the land, from removing from it a soldier's monument erected pursuant to a vote of the town. The issue tried was whether the land was acquiring by plaintiff as a common by adverse possession under a parol gift, or whether it belonged to defendant. Witness Bestor was allowed to testify, over the defendant's objection, that he was 78 years old and had lived in Enfield all his life; that his gsandmother settled in the town in 1802, and died in 1857; and that "he had heard his grandmother and the rest of the old people talk about it, and say that Robert Field gave the common and burying ground to the town of Greenwich." Another witness named Harwood was allowed to testify that his father, who died in 1908, at the age of 78, told him "that his (the

witness') grandfather said that Robert Field gave this piece of land to the South Parish of Greenwich for a common."

In holding that the evidence was properly admitted, the Court said:

"These declarations, being declarations upon a matter of general if not of public interest, are within one of the exceptions to the rule excluding hearsay evidence so far as the subject-matter of them is concerned. As to this see Hall v. Mayo, 97 Mass. 416, 418; Boston Water Power Co. v. Hanlon, 132 Mass. 483, 484.

"It is generally laid down that evidence to be admissible under this exception to the role against hearsay must be evidence of a general or common reputation as to the existence or non-existence of the matter of public or general interest. . . . The statement of the rule heretofore made in our decisions might raise the question whether reputation evidence in this connection means anything more than evidence which is reputed to be the fact as distinguished from evidence which is known by the declarant to be the fact and so to include the individual assertion of a deceased person not made on personal knowledge.

. . .

"We do not find it necessary to pass upon that question here. For if this exception is limited to cases where there was a general or common reputation, we are of opinion that it would be going too far to limit the exception to cases where the declarant stated that there was a general reputation. Since it is not possible to determine by a preliminary examination whether there was or was not a general reputation, we are of opinion that a declaration by the deceased declarant that he had heard the fact "from old persons" now deceased is competent evidence of a general or common reputation. Bestor's testimony therefore was competent so far as this matter is concerned. And see Wigmore on Evidence, Sec. 1584. If it is competent to prove a general or common reputation by the declaration of one person that he had heard the fact from old persons now deceased, it is equally competent to prove a general or common reputation by putting in evidence the declarations of many persons where each declarant heard of the fact from one person only. Where all the residents of the place in question are severally shown to have made the statement, a general or common reputation is made out in proof. In like manner a general or common reputation is made out where many although not all are shown to have made individual assertions of the fact. We are therefore of opinion that Harwood's testimony, in connection with Bestor's, was admissible so far as this consideration is concerned."

Citations to other cases applying the rule may be found in the footnotes to Section 1097 of Jones Commentaries on Evidence, 2nd Ed., Vol. III, p. 2022.

The use of the road in question as a military road during the Civil War tended to show its public character, and hence testimony as to

its use was logically relevant to the issue before the court. Such use would be a matter of public notoriety and would cause public comment and discussion to such an extent that a fairly trustworthy reputation with respect thereto would inevitably arise. The declarant was shown to have lived in the community, and his declaration was made made long before any controversy arose over the use of the road as a public road. It also was shown that the declarant was dead at the time of trial. We believe that all the elements necessary under the rule to make the declaration admissible wore present in this case, and that the trial court did not err in its ruling in this respect.

Appellant also urges that plaintiff failed to sustain the burden of proof that the roadway in question had been in existence in the same location since 1877.

The evidence discloses that no public money or labor has ever been expended on this road. Therefore, in order to prevail, it was necessary for plaintiff to prove that a right of prescription was established for ten years prior to March 30, 1887. [Revised Statutes Missouri 1939, Sec. 8485, Mo. R. S. A. Sec. 8485. State ex rel. McIntosh v. Haworth (Mo. App.), 124 S. W. (2d) 653.]

Charles Ray testified that he has known the road for about 45 years, and that when he first traveled it the road looked like it had been in use for many years. G. E. Kemp, age 71, first observed the road in its present location when he was six years old. Jesse Ballew because acquainted with the road in 1895. It looked like an old road then. J. P. Gibson, age 65, stated he had known the road ever since he could remember. Jampes P. Ballew, age 64, traveled the road when he was 10 or 12 years old, and it looked like an old road then. A number of other witnesses testified to having traveled the road many times prior to 1926, the date at which, according to defendant's evidence, the road was established by Robert Wench. There is also the testimony of Charles Ray and Fred Ballew above referred to. The trial judge heard this testimony, and from the appearance and demeanor of the witnesses, was better able to judge of their credibility then we are from an examination of the record. There is nothing in the evidence which casts any suspicion upon the credibility of the witnesses for the plaintiff. They apparently were disinterested, and from the record it appears that they were trying to tell the truth. Many of the witnesses for defendant, who testified that the road was first opened in 1926, were related to the defendant.

After reading the testimony of both parties in this case, and after carefully considering and weighing the same, we have reached the conclusion that plaintiff has not only met the burden of proof in establishing said prescriptive right to the road in its present location, but that plaintiff has produced convincing evidence which has established beyond doubt that the road has been continuously used by the general public with the knowledge of the defendant, and her pre-

776

decessors in title, adversely, since its establishment and until it was closed by defendant in 1945. The evidence not only shows the establishment of a prescriptive right to the use of the road; it also shows that there never was any abandonment of the road on the part of the public.

The judgment appealed from is affirmed. *Hughes, P. J.,* and *McCullen, J.,* concur.