Edward S. BAUGH and Dorothy M. Baugh, his Wife, Appellants,

v.

Frank P. GRIGSBY and Lucy May Grigsby, his Wife, Respondents.

No. 44776.

Supreme Court of Missouri.

Division No. 1.

Feb. 13, 1956.

Omer H. Avery, Troy, for appellants.

Fred D. Wilkins, Louisiana, Derwood E. Williams, Troy, for respondents.

COIL, Commissioner.

Appellants, referred to herein as plaintiffs, brought an action to quiet title to real estate in Lincoln County (the *Cornick rural school site) consisting of approximately one acre with a school building thereon. Plaintiffs alleged that respondents, called defendants herein, claimed an interest in the land by virtue of their purchase of it at a public sale from Reorganized School District R–IV of Lincoln County. The trial court adjudged fee-simple title in defendants, and plaintiffs have appealed.

Plaintiffs claimed that they held the record title. That claim was based upon a deed from one Trescott to his daughter and by a subsequent conveyance by Trescott's daughter to Mr. and Mrs. Smith, who, in turn, conveyed by warranty deed dated November 20, 1947, to plaintiffs. That last-mentioned deed, as did the other deeds beginning with the one from Trescott to Miller, conveyed inter alia "6⅔ acres off of the South side of the Northeast quarter of the Northwest quarter of Section 10." It was established that the land in controversy (except for a small part thereof

not of significance in our disposition of this case) was included within the easternmost acre of the 6⅔ acres above mentioned. So that if Trescott had title to the 6⅔ acres he purported to convey to Kate M. Miller, his daughter, by his deed dated May 30, 1901, then plaintiffs sustained their burden to prove that they held the record title under which they claimed. On the contrary, if Trescott did not have title to the easternmost acre of the 6⅔ acres he conveyed to his daughter, then, of course, plaintiffs failed in their proof as to the record title and they made no other claim of title.

■ It is well established that plaintiffs must succeed upon the strength of their own title and, consequently, if plaintiffs failed to prove prima facie that they held the record title, they have no interest in the land. Cullen v. Johnson, 325 Mo. 253, 271, 29 S.W.2d 39, 46.

We, therefore, examine the evidence to determine whether Trescott did have title to the easternmost acre of the 6⅔ acres off the south side of the NE¼ of the NW¼ of Sec. 10 at the time he purported to convey title to that acre. An August 10, 1849, patent from the United States to one Parker granted to him the north half of the NW¼ of Sec. 10. (It should be noted that that patent included also the east half of the NE¼ of Sec. 9, which, together with the north half of the NW¼ of Sec. 10, was described as containing 160 acres, thus indicating, in the absence of evidence to the contrary, that each quarter quarter there mentioned was of the standard size of 40 acres.) By a September 24, 1858, Lincoln County Circuit Court judgment, Presley A. Tipton and his wife acquired title to the north half of the NW¼ of Sec. 10. (Again the east half of the NE¼ of Sec. 9 was described jointly with the north half of the NW¼ of Sec. 10, and these two parcels were again described as containing 160 acres.) On November 19, 1866, Presley A. Tipton and his wife conveyed to Enos Trescott certain lands including that described as follows: "and Thirty Nine Acres, being *part* North East Fourth of North West Quarter Section Ten, * * *."

(Our italics.) The last-mentioned deed is the only one by which plaintiffs claimed that Enos Trescott obtained title to the acre of ground now in question.

It is apparent that the last-mentioned deed did not convey title to *all* of the NE¼ of the NW¼ of Sec. 10, but only to a *part* thereof, viz., 39 of the 40 acres contained in that quarter section. It is true that grantor Tipton did not describe either the 39 acres conveyed or designate the acre excepted. Other evidence in the record, however, throws light upon the question of whether the one acre not conveyed was in fact the acre which included the school site now in controversy.

Andrew J. Brown, a witness for both plaintiffs and defendants, a surveyor who had practiced his profession in Lincoln County for over forty years, had surveyed and platted the Cornick School site as it appeared in 1952. Among other things, he testified that the 6⅔ acres off the south side of the NE¼ of the NW¼ of Sec. 10, as described in Trescott's deed to Miller, would be and was a strip of land 217 feet from south to north. That is to say that the north line of the 6⅔ acres ran from a point 217 feet north of the southeast corner of the NE¼ of the NW¼ west to a point 217 feet north of the southwest corner of the NE¼ of the NW¼. As noted, however, the plat purported to be one of the school site as it appeared in 1952, based upon existing landmarks and certain deductions the witness made therefrom. By reason of the fact that in 1952, and for 20 to 30 years prior thereto, there was a public road which ran in a northwest-southeast direction which appeared to bound the school site, it was assumed that such public road constituted the north boundary of the land in question. As a result, the east line of the school site as platted in 1952 was only 152 feet. As noted, the witness testified that the eastern acre of the 6⅔ acres contained the school site and that that acre extended northwardly from the southeast corner of the NE¼ of the NW¼ of Sec. 10 a distance of 217 feet. So that, in fact, the easternmost acre of the 6⅔ acres extended northwardly across the public road for a

distance on its east line of 65 feet. The north boundary of that acre extended westwardly to the west line of the acre a place also 217 feet north of the south quarter-section line. The significance of the foregoing will hereinafter appear.

The evidence further showed that at some time 20 or 30 years prior to trial in 1954, the location of the public road as it existed at the time of trial and in 1952 at the time the plat was made had been moved some 30 feet northwardly from its prior location.

The evidence further showed that a Cornick School, a log building, was in existence and being operated by Cornick School District No. 49 or its predecessor for at least a number of years prior to 1865; that that log building was located north of whatever road was then in existence; and that the school site at that time included the land (now in controversy) south of the present public road. In 1888 or 1889 a new building (the one now in existence) was constructed in its present location which was "south of the road."

In view of that testimony by two witnesses who had attended the Cornick School when it was a log building "north of the road" and had also attended the school which was later constructed "south of the road," and in view of the fact that, based upon the surveyor's testimony, the easternmost acre of the 6⅔ acres extended 217 feet northwardly from the post at the southeast corner of the NE¼ of the NW¼ of Sec. 10 and that the road now in existence had been moved 30 feet northwardly from its location 20 or 30 years prior to 1954, thus making it physically feasible for the log school to have been located on a part of the easternmost acre of the 6⅔ acres, it would appear that the most reasonable inference is that the original Cornick School, the log building, was in fact located on part of the easternmost acre of 6⅔ acres off the south side of the NE¼ of the NW¼ of Sec. 10, the same acre which contains the site now in question. If that is true, and based upon all the evidence we think it is the correct inference, then it seems apparent to us that Tipton would

not have conveyed to Trescott the acre of ground upon which an operating school building was then located without some reference thereto, and that, consequently, the one acre not conveyed in the 39-acre part of the quarter section was the acre of ground on which the school was then and is now located.

The only evidence offered which might be said to be contra to that from which we have reached the conclusion that the old log school was in fact located on an acre of ground which includes the major part of the present school site was excluded by the trial court. Clyde Smith, plaintiff's immediate grantor and the grandson of Enos Trescott, was asked this question by plaintiff's counsel: "I will ask you whether or not you heard your grandfather make any statement at or about the time that this school district moved from the north to the south side of the road concerning matters relating to possession and title of this land." An objection was sustained and this offer of proof thereafter made: "* * * that if the witness were to answer the question he would testify and state that he had heard his grandfather, Enos Trescott, say on several occasions at and during the time that this school was moved from the north side of the road to the south side of the road that members of the School Board came to him and requested to get a site south of the road away from the church because of windows in the church being broken as a result of using the play ground adjacent to the church and that his grandfather, Mr. Trescott, told them that he wouldn't deed then any land but that he would permit them to build a school house on the south side of the road and use it as long as it was necessary for school purposes but that it would remain as a part of the farm owned by Mr. Trescott and go back to that farm when no longer used as a school."

That evidence was offered for the primary purpose of showing that the school district originally obtained only a permissive use of the land in question in order to destroy defendants' claim that the school district had obtained title by adverse possession. While the question of the district's

adverse possession as to plaintiffs' grantors has been temporarily, at least, eliminated by reason of our conclusion heretofore, the fact remains that the proffered evidence, if admissible, would cause a reconsideration of the matter determined, because such evidence would tend to prove that the original location of the log school building north of the road was not within the easternmost acre of the 6⅔ acres.

Plaintiff contends that Smith's testimony was admissible under the exception to the hearsay rule which admits hearsay if it relates to an ancient matter of public or general interest and if the evidence appears to be in the nature of a tradition or community reputation with reference to a fact or matter relevant to the controversy. The exception relied on was found, at least in a measure, to satisfy the two underlying reasons for any exception to the hearsay rule, viz., a necessity for and a circumstantial guarantee of the trustworthiness of the offered evidence. As the author points out in Wigmore on Evidence, 3rd Ed., Vol. V, § 1580, pp. 444–445, necessity is found in the lack of other satisfactory evidence, including the absence of living witnesses with knowledge of the facts about a given matter in controversy. The circumstantial guarantee of trustworthiness is found in the fact that a "community's conclusion" about a topic of public or general interest, generally inquired about and generally discussed is likely to have been, through a sifting process, a trustworthy conclusion. In discussing this element of circumstantial probability of trustworthiness as to reputation testimony, the same author at §§ 1583 and 1584, pp. 447–449, states: "The element here operating to supply a fair degree of trustworthiness is the third already noticed (*ante,* § 1422), namely, the consideration that the prolonged and constant exposure of a condition of things to observation and discussion by a whole community will in certain cases sift the possible errors and will bring the resulting belief down to us in a residual form of fair trustworthiness. These conditions are usually found where the matter is one which in its nature affects the common interests of a number of persons in the same locality, and thus necessarily becomes the subject of active, general, and intelligent discussion; so that whenever a single and definite consensus has been reached in the shape of common reputation, it may be supposed to have considerable evidential value. * * * This being the well-accepted foundation for receiving a common reputation as trustworthy, certain limitations are deducible as a necessary consequence. * * * What is offered must be in effect *a reputation,* not the mere *assertion of an individual.* This follows from the nature of the foregoing principle, and is the thought running through the language of all the judges. But reputation includes and is often learned through the assertions of individuals; it is therefore constantly necessary to distinguish between (a) assertions involving mere individual credit and (b) assertions involving a community-reputation. The common form of question put to a reputation-witness was: 'What have you heard old men, now deceased, say as to the reputation on this subject?' The judges constantly speak of 'reputation from deceased persons.' Thus, though in form the information may be merely what deceased persons have been heard to say about a custom, yet in effect it comes or ought to come from them as a statement of the reputation. This aspect of the rule is frequently found stated in the form 'the reputation must be general'; in other words, the hearsay statement 'I know the right or custom to be such-and-such' is not receivable; but 'I understand the general acceptance of the custom by the community to be such-and-such' is admissible. The deceased individual declarant is merely the mouthpiece of the reputation. Whenever, therefore, individual declarations are offered, they must appear to be, in the words of Baron Wood, 'the result of a received reputation.' "

In Greenleaf on Evidence, 16th Ed., Vol. 1, § 139, p. 225, the author, in describing the exception involved, states: "The exception we are dealing with exists only for reputation, i. e. the community opinion; what is offered must be in effect a reputation, not the mere assertion of an individual. * * * Thus, testimony that R., now deceased, had planted a willow in a certain

spot to show a road-boundary was rejected; 'he does not assert that he has heard old men say what was the public road; but he plants a tree and asserts that the boundary of the road is at that point; it is the mere allegation of a fact by an individual; that is, he knew it to be so from what he had observed and not from reputation.' Conversely, whatever form the evidence takes, it is receivable if it involves and implies a reputation."

We think the trial court correctly excluded this evidence for the reason that neither the question nor the offer of proof purported to elicit or contain a community's conclusion or the general reputation in the community as to the subject in controversy. The offer of proof shows that the witness would testify that Trescott stated on several occasions to the witness alone that the school board members had requested a site for the school south of the road and that he had replied that he would not deed them land but would permit them to build a schoolhouse there and use it as long as necessary for school purposes but that the land would revert to his farm when no longer used for school purposes. It seems apparent to us that Trescott, the asserter, was not the mouthpiece of any reputation or community conclusion, but that he stated to the witness a fact which he knew because of his individual dealings with members of the school board. It was nothing the asserter purported to know by reason of a community's conclusion with reference to the subject matter. It was a statement which involved only the individual credit of the asserter.

That is not to say that the form of the question asked or the form which the answer takes must include any particular words to make the evidence admissible. If it appears that the question calls for or the answer supplies a fact which involves and implies a reputation, then the trustworthiness feature of the exception is satisfied. See Jordan v. Parsons, 239 Mo.App. 766, 199 S.W.2d 881, where it appeared that the questions and answers there involved did in fact call for and state declarations which implied a relating of a community understanding or opinion. (Cf. School District of Donegal Township v. Crosby, 178 Pa.Super. 30, 112 A.2d 645, wherein the question of the admissibility of evidence involved evidence identical with that here offered. The court in Crosby held that the offered evidence was inadmissible for the reason that it was offered as evidence to sustain a title as opposed to reputation pertaining to the location of private boundaries. We do not agree that the evidence proffered in the instant case was properly excluded for the reason assigned in the Crosby case because, while the instant evidence, if admitted, would, of course, tend to establish plaintiffs' title, nevertheless it would more primarily defeat the claim of adverse possession asserted by the defendants and, consequently, would be, we think, admissible in this case if it were in fact reputation evidence.)

It must follow that plaintiffs failed to make a prima facie showing of record title in them and, because they claimed no other title, the trial court correctly adjudged that plaintiffs had no title or interest in the land. Cullen v. Johnson, supra.

Plaintiffs, having no title to the land in controversy, are not aggrieved by a judgment adjudging title in defendants and, of course, may not complain thereof. Harrington v. Muzzy, Mo.Sup., 258 S.W.2d 637, 639 [3]. In view of our holding as to plaintiffs' claim, there is no issue before us as to the correctness or validity of the trial court's judgment quieting title in defendants.

The judgment is, therefore, affirmed.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.