**CHAMBERS COUNTY, Appellant,**

v.

**J. M. FROST, Jr., et al., Appellees.**

No. 3946.

Court of Civil Appeals of Texas.

Waco.

March 22, 1962.

Rehearing Denied April 26, 1962.

DeLange, Hudspeth & Pitman, C. M. Hudspeth, Houston, W. G. Walley, Jr., Beaumont, Eugene T. Jenson, Anahuac, Sam W. Mintz, Houston, for appellant.

Eastham & Williams, Willard C. Williams, Williams, Lee & Lee, Jesse J. Lee, Houston, for appellees.

TIREY, Justice.

Chambers County brought this action to establish an easement and right-of-way for highway purposes over four tracts of land that constitute segments in what is designated as the Sykes Road and the Rice Farm Road, which roads, including the portions here in controversy, were claimed by the county to be public roads. The county alleged vast expenditures of public funds for the improvement and maintenance of such roadways, and its claim to such easement was based upon dedication for public use and also upon prescriptive rights that vested in the public to use such roadways, and it sought injunctive relief against interferences by the defendants. The county, in the alternative, sought a decree of condemnation with award to the defendants of their damages. The jury in its verdict found in favor of the county on the dedication issues with respect to the portion of the Sykes Road, and in favor of the county on the prescription issues with respect to the portions of both roads. The Court, on motion of defendants, disregarded the verdict of the jury and rendered judgment that appellant take nothing by reason of its action. On the county's alternative plea of condemnation, the court decreed a recovery by the county of a right-of-way easement for public road over the tracts in question, and upon the verdict of the jury decreed that the defendants recover from the county the sum of $16,500.00 as damages for the tracts taken, together with interest at the rate of 6% per annum from date of judgment, and all costs of court, and decreed further that the payment of said judgment, interest and costs by the county to the Clerk of the Court shall

constitute full satisfaction, and the Clerk is directed to pay the amount of the judgment to the defendants, and decreed in said judgment that upon payment and satisfaction thereof the sum of $30,000.00 theretofore deposited by the county with the District Clerk of Chambers County as security for payment and damages shall be refunded by said Clerk to the county and temporary injunction thereof be dissolved.

Appellant assails the judgment on what it designates as 11 Points. Points 1, 2 and 4 are to the effect that an easement to the Sykes Road was established both by implied dedication and prescription under the evidence and by the verdict of the jury; (2) Points 3 and 4 are to the effect that an easement to the Rice Farm Road was established by prescription under the evidence and by the verdict of the jury; (3) Points 5 to 11, inclusive, are to the effect that the damages assessed by the jury are without support in the evidence.

The jury, in its verdict, pertinent to Points 1 through 4, inclusive, found substantially: (1) That the Sykes Road was used and traveled by the public generally continuously and uninterruptedly for ten years or more before January 28, 1958; (2, 3, 4 and 5) That such use was open, visible, notorious and adverse to the defendants and their predecessors in title, and that such use and travel was under a claim of right, and that such use was with the knowledge of defendants and those under whom they claim; (6) That defendants, and those under whom they claim interposed objections to such use and travel; (7) That during the period of ten years or more, prior to the 28th day of January, 1958, the county repaired and improved the roadway known and described as the Sykes Road with public funds; (8) That defendants, and those under whom they claim had knowledge of such; (9) That defendants, and those under whom they claim, interposed objections to such; (10) That prior to January 28, 1958, the defendants, and those under whom they claim, intended that the portion of the roadway described as Sykes Road should be used and traveled by the public generally, and maintained and improved with public funds; (11) That the portion of the roadway described as the Rice Farm Road was used and traveled by the public generally, continuously and uninterruptedly for ten years or more from January 28, 1958; (12) That such use and travel was open, visible and notorious; (13) That such use and travel was adverse to the defendants; (14) That such use and travel was under a claim of right; (15) That such use and travel was with knowledge of the defendants; (16) That defendants interposed objections to such use and travel; (17) That during the period of ten years, or more, prior to the 28th day of January, 1958, the county repaired and improved the road known as the High Dump Road, or Rice Farm Road with public funds; (18) That defendants had knowledge of such repairs and improvements; (19) That defendants interposed objections to such improvements; (20) That prior to January 28, 1958, defendants intended that the portion of the roadway described and known as Rice Farm Road should not be used and traveled by the public generally and maintained and improved with public funds; (21) That prior to the 28th day of January, 1958, the county repaired and maintained the roads in controversy with public funds; (22) That defendants had knowledge of such repairs and maintenance; (23) That defendants interposed objections to the county making such repairs and maintenance; "(24) Do you find from a preponderance of the evidence that plaintiff, Chambers County would not have made such repairs and maintenance if defendants had objected thereto?" The jury did not answer this issue. "(25) Do you find from a preponderance of the evidence that the letters of A. W. Marshall, the Chambers County Right-of-Way Agent, written to J. M. Frost, Jr., between January 23, 1947, and June 26, 1947, recognized that J. M. Frost, Jr., owned the road known as 'Sykes Road'

or 'Fairview Road?'" To which the jury answered "Yes". "(26) Do you find from a preponderance of the evidence that after June 26, 1947, the date J. M. Frost, Jr., received the last letter from A. W. Marshall, the Chambers County Right-of-Way Agent, the plaintiff, Chambers County, repudiated its recognition, if any, of the ownership of J. M. Frost, Jr., and commenced the assertion of an open and notorious adverse claim of right to use a road substantially the entire area of 'Sykes Road' or 'Fairview Road', as described in Plaintiff's Second Amended Original Petition?" To which the jury answered "Yes". "(27) Do you find from a preponderance of the evidence that the County gave notice to the defendants between June 26, 1947, and January 28, 1948, that Chambers County had repudiated its former recognition of J. M. Frost, Jr.'s ownership of the road known as 'Sykes Road' or 'Fairview Road'?" To which the jury answered "Yes". "(28) Do you find from a preponderance of the evidence that the only substantial use made of the road running through the land described as 'Sykes Road' or 'Fairview Road', before January 25, 1958, was by persons who had express or implied permission to use the road from the defendant, or any of them?" To which the jury answered "No." "(29) Do you find from a preponderance of the evidence that the letters of A. W. Marshall, the Chambers County Right-of-Way Agent, written to J. M. Frost, Jr., between January 23, 1947, and June 26, 1947, recognized that J. M. Frost, Jr., owned the road known as 'High Dump Road' or 'Rice Farm Road'?" To which the jury answered "Yes". "(30) Do you find from a preponderance of the evidence that after June 26, 1947, the date J. M. Frost, Jr., received the last letter from A. W. Marshall, the Chambers County Right-of-Way Agent, the plaintiff Chambers County, repudiated its recognition, if any, of the ownership of J. M. Frost, Jr., and commenced the assertion of an open and notorious adverse claim of right to use as a road substantially the entire area of 'High Dump road' or 'Rice Farm Road', as described in Plaintiff's Second Amended Original Petition?" To which the jury answered "Yes". "(31) Do you find from a preponderance of the evidence that the county gave notice to the defendants between June 26, 1947, and January 28, 1948, that Chambers County had repudiated its former recognition of J. M. Frost, Jr.'s ownership of the road known as 'High Dump Road' or 'Rice Farm Road'?" To which the jury answered "Yes". "(32) Do you find from a preponderance of the evidence that the only substantial use made of the road running through the land, described as 'High Dump Road' or 'Rice Farm Road', before January 25, 1958, was by persons who had express or implied permission to use the road from the defendants, or any of them?" To which the jury answered "No." "(33) Do you find from a preponderance of the evidence that the Defendants, Mr. Frost, his family, or those working for him, regularly and systematically prevented hunters from using and traveling the portions of the 'High Dump Road' or 'Rice Farm Road' and the 'Sykes Road' or 'Fairview Road' running through the Frost ranch?" To which the jury answered "No." "(35) Do you find from a preponderance of the evidence that Chambers County, in the first five months of 1957, offered to fence the sides of the roads in controversy, if J. M. Frost, Jr., would cease interfering with the use of these roads?" To which the jury answered "Yes". "(36) Do you find from a preponderance of the evidence that the offer of the County to fence these roads if J. M. Frost, Jr., would cease interfering with the use of them, if you have found such an offer was made, was a recognition of that Defendant's ownership of these roads?" To which the jury answered "No." The testimony includes five volumes totaling 962 pages. Volume 6 contains maps and exhibits relating to the subject matter of this litigation. It is quite obvious that we cannot make an extended summary of all the testimony, and since we have a jury verdict, it would serve no useful purpose.

However, since the court disregarded the findings of the jury favorable to the county on the question of dedication and prescription, we think it necessary to make a short statement. The County Engineer testified in part to the effect that he had been acting as such since November 16, 1945, and that prior thereto in 1941 he was a resident engineer for the Highway Department at Liberty and had under his supervision the highways of Chambers and Liberty Counties; that he had been familiar with the roads in controversy since he became County Engineer, and that in November 1945 the Rice Farm Road was shelled all the way to the intersection of the Sykes Road, and the Sykes Road had shell on it from that intersection east toward highway 124, and from the foregoing intersection to the west it was only a graded road; that immediately after he took office he caused regular maintenance and repair work to be done over each of these roads, using maintainers and road graders after each rain. Minutes of the Commissioners' Court were introduced showing adoption on June 5, 1946, of a program of road improvements to be carried out and financed by a three million dollar bond issue; that Sykes Road and Rice Farm Road existed on the ground at that time, and that he superimposed upon a map tendered in evidence, with a pen, the locations of Sections Nos. 95, 103, 105 and 115, marking all the land in controversy, which were portions of the Sykes Road and the Rice Farm Road; that the Commissioners' Court proposed that Rice Farm Road be shown as type C road, and that it have 6-inch shell base, and be 16 feet wide, and that the Sykes Road would be type B road, and would also have 6 inches of shell, and would be 18 feet wide. The bond issue referred to was adopted in July 1946. A traffic count map of the county showing the annual average of 24-hour traffic volume during October 1, 1947 to September 30, 1948, was tendered in evidence. This traffic map showed the Rice Farm Road, and the Sykes Road to be graded and drained. This traffic count showed that during a period of 24 hours over 100 cars used the Rice Farm Road, and the Sykes Road between the Rice Farm Road and State Highway 124, that the traffic count was 215 cars per 24-hour period; that on the Sykes Road to the west of the Rice Farm Road the traffic count was 55 vehicles per 24 hours; that in 1946 he applied shell to the Rice Farm Road, and it was completed in 1947, and that he started work on the Sykes Road in 1946, and worked on it a couple of years; that a portion of the cost of repairs and maintenance expended on these roads was expended on the portion of the roads in controversy, and that the amount expended on these portions estimated more than an average cost of the bond proceeds expended; that at the time these repairs were made he knew nothing of any private claim or ownership, and that as County Engineer he first learned that Mr. Frost was contending that the portions of the Sykes Road and the Rice Farm Road were not public roads when Frost fenced them in January 1958; that prior to this time the County had expended on 7⁹⁄₁₀ miles of the Sykes Road, including the two miles in controversy, from and after 1946 to May 15, 1957, a total of $81,821.62, which was an average cost of $10,909.55 per mile for shell, truck hire, labor and miscellaneous items; that a source of these funds was the 1946 county road bond issue; that these figures did not include the cost of blading the road that was done after each rain, the blading cost having been paid out of the regular county precinct maintenance fund; that he would not have caused the work to have been done had he not believed that these roads were public roads, and that he did this work for the County under a claim of right of the County to care for these roads; that in November 1945, as Engineer, he found that the Rice Farm Road, including the portions in controversy, in poor condition with only one or two inches of shell on it, and full of "pot holes"; that the Sykes Road was in worse condition than the Rice Farm Road; that a portion of the Sykes Road located on Sections 105 and 115 was sub-

-stantially a dirt road; that the width of the Sykes Road through Sections 105, 115 and 103 were about 80 feet; that the crown of the Rice Farm Road, or the portion used for travel, was about 30 feet in width, and that none of defendant Frost's tenants or employees ever told him that the road was a private road, or that Frost did not want the county "fooling with his private roads and private cattle guards and wanted the county to leave them alone", and he knew of no claim of Frost until he built the fence across the road in January 1958; that Dow, a tenant of Frost, called him a number of times to complain about the condition of the road through the sections here in controversy, and that Dow wanted them kept up in good shape, with the proper amount of shell on them, and that if some cattle guards on the road got bad, Dow called him to have them fixed immediately; that he knew of his own personal knowledge that the Sykes Road, including the portions in controversy, was built by the county with county machinery and county men in 1941, and he did not know of his own personal knowledge who originally built the Rice Farm Road. There is an absence of testimony to the effect that Mr. Frost was interfering with the use by the county or the public of either the Sykes or the High Dump Road. The minutes of a special session of the County Commissioners Court were tendered in evidence showing the adoption on June 5, 1946, of a program of road improvement to be carried out and financed by a Three Million Dollar bond issue. The program was set forth by a map attached, a copy of which was introduced in evidence. The witness stated that the Sykes Road and the Rice Farm Road existed on the ground at that time as shown on the County map portraying the 1946 road bond program; that after the bond issue was passed (under the order of the Commissioners' Court) he applied shell to the Rice Farm Road, which was commenced in 1946, and was completed in 1947; that the County started work on the Sykes Road in 1946 also, and worked on it a couple of years;

that a portion of the cost of repairs and maintenance expended on the Sykes Road and the Rice Farm Road was expended on the portions of the roads in controversy, and that the portions of roads here involved entailed more than average cost of bond proceeds expended; that he did not know at the time that he caused these repairs and improvements to be made about any claim under private ownership, and that he as County Engineer first learned that Mr. Frost was contending that the portions of the Sykes Road and Rice Farm Road involved were not public county roads when Mr. Frost had them fenced on January 28, 1958. He further testified that commencing in 1946 the County expended from the proceeds of the bond issue through January 31, 1957, on Rice Farm Road, including the portions in controversy, for shell, truck hire, culverts, labor and miscellaneous costs, a total of $32,643.40, or an average of $6,528.68 per mile; that if the county officials and he had not considered the Rice Farm Road in its entirety a county road from 1946 to the present day, he, as County Engineer, would not have expended the public funds or made the repairs and improvements that he made on that road. F. W. Otter testified in part to the effect that he is 76 years of age, and had lived in Chambers County some 62 years, and that he has been engaged as a county construction worker in Chambers County for 26 or 27 years; that he helped build the entire Sykes Road from the Farm-to-Market Road to State Highway 124; that this was in the year 1942 or 1943; that the road was completed in about one year for dirt work, but not the topping; that prior to that time it was a narrow dirt road that was difficult to travel, and the small bridges would fall down; that it had a 14-foot crown, and the ditches were shallow; that when County Commissioner Broussard took it over he widened it and raised the dirt work, this being the first work that was done on it; that he was hired to help run the machines, and that the County used a cat, blade and maintainers to build the road, and that they had to let the dirt work

settle for two or three months before they put on the shell topping; that 40 or 50 trucks were used on the shelling job, and that the entire road was shelled in about three or four months; that the building of the road and topping required about one and one-half years; that after the construction of the Sykes Road, he, as an employee of the County, also worked on the maintenance of the road; that the county had to keep it smooth; that when it got bad the county put more shell on it, from 3 to 6 inches all way through, and not just a patch; that originally 6 inches of shell was put on the Sykes Road, and it was 16 or 18 feet wide; that the county did a lot of patching, but twice they re-built it. With reference to maintenance, he said they would generally try to get out after the rains and work the road, and after the county built the Sykes Road there had been no gates across it and that he did not recall any gates crossing it prior to the time the County built the Sykes Road. With reference to the Rice Farm Road he said substantially that the High Dump Road was started in about 1937, and about the year 1939 the rice farmers who were farming in that area wanted the dump leveled down and shelled so that they could use it to bring their rice out; that the farmers made a road out of it; that he was there, and that as an employee of the county, leveled down the High Dump Road, and that until 1939 or 1940 when the county leveled the road for topping, that it could be used only on horseback; that the county leveled it in the year 1939 or 1940, and as soon as it was leveled the county put the first coat of shell topping on it, being a 6-inch coat, and 14 or 16 feet wide; that thereafter the county maintained the road and did patch work on it, and that the county has re-shelled it from one end to the other, two or three times, and that this re-shelling was done since Mr. Pinchback became County Engineer; that he had never seen anyone else shell or maintain that road, and that he and four other county employees ran the maintainers; that he never say any signs on the road to the effect that they were private roads for the

Frost family until five or six months ago, (time of trial 1960) and that the witness traveled up and down these roads on an average of 8 or 10 times per year. Appellee, J. M. Frost, Jr., testified in part to the effect that he first saw Sykes Road at the time it was built, and that he imagined that it was completed during the Summer of 1941; that he first started using the Sykes Road in 1942, but could not say whether it was completed at that time from the Farm-to-Market Road all the way over to the Winnie-High Road; that during the year 1948 or 1949 he saw the county blading the High Dump Road; that he asked the man who was on the maintainer what he was doing on his road; that it was a private road, and the man told him to talk to Mr. Pinchback, his boss, and that that was the last of that. He further testified that he did not shell any portion of the Sykes Road.

"Q. You have never * * * had a gate across Sykes Road or High Dump Road here involved in this controversy?

"A. No, Sir, my attorney told me—

"Q. You have answered my question and if you have anything further Mr. Williams can ask you about it, but you never locked any gates on Sykes Road for any period of two weeks?

"A. No, Sir.

"Q. Never been a gate on there?

"A. I don't recall any.

"Q. And there has never been a fence completely across the road to stop the traveling public from using it at will and as a matter of right?

"A. No, Sir."

See Stanolind Oil & Gas Co. et al., v. State et al., 136 Tex. 5, 145 S.W.2d 569, Point 1, Page 570, and authorities there cited. See also cases collated under Vol. 16A Texas Digest, Evidence, ☞553(4) p. 591.

Winser, Jr., testified to the effect that he served as a member of the Chambers County Commissioners' Court during the years

1953 and 1954; that during the time he was Commissioner, crews under the direction of Mr. Pinchback, and with County equipment graded or bladed the entirety of the Sykes Road and the Rice Farm Road on an average of once per month; that he never heard any protest from anyone that the County should not be maintaining the County roads at county expense; that he had been traveling both of these roads in his rice farming operations for about 15 years, and that he had observed regular county maintenance of the roads in the way of blading operations and shelling operations as a regular practice; that he was living in Chambers County in 1946, and was using those roadways; that he recalled the 1946 bond issue, and that prior to that time Sykes Road from Highway 124 to the Farm-to-Market Road that runs into Anahuac was not a well-improved shell road; that in 1947 the entire road had greatly improved, and since that time the road had been graded and shelled; that before the 1946 bond issue the Rice Farm Road was not in top condition, but after the passage of the bond issue in 1946 it was greatly improved, and that was within a year after passage of the bond issue; that since he became familiar with the Sykes Road and the Rice Farm Road in 1942 or 1943 he has seen all sorts of vehicles travel over those roads, including trucks, passenger cars, pick-up trucks, station wagons, and little doodle-bug cars; that prior to the institution of this suit Mr. Frost had never told him, as a Commissioner or otherwise, that the public was not entitled to use those roads that run through his ranch; that he himself traveled those roads as a matter of right and thought he had a right to travel them; that while Commissioner during 1953 or 1954, Mr. Harvey Dow, who farmed the land for Mr. Frost, made complaints about the condition of the Sykes Road, and that during that time he had been farming in Chambers County and was a County Commissioner on up to January 25, 1958, and that to his knowledge there never was a gate across the Sykes or High Dump Road to stop traffic from going through from the year 1946 on. The Court in its Charge instructed the jury: "By the term 'adverse' as used in this Charge is meant an actual, exclusive use and appropriation of the lands involved over which the road involved runs, for public road purposes, commenced and continued under a claim of right, inconsistent with and hostile to the claim of the defendants." With reference to the Sykes Road one witness testified that the Sykes Road had been in existence and had been traveled and used by the public for thirty years, or more. It is without dispute that Mr. Frost acquired the land adjoining it in 1946. The jury in its verdict (Issue 10) found from a preponderance of the evidence that prior to January 28, 1958, the defendants, and those under whom they claim, intended that the portion of the roadway described and known as Sykes Road or "Fairview Road" should be used and traveled by the public generally and maintained and improved with public funds. We think the foregoing Issue presented an ultimate fact issue to the jury that is controlling with reference to the Sykes Road. So, the question before us is: Is the evidence sufficient to sustain such finding? We think the answer is "Yes", and that the answer is sustained by the great weight and overwhelming preponderance of the evidence. We are of the view that the evidence shows that during the period of time prior to January 28, 1958, that the appellees and their predecessors in title permitted the county to improve and maintain with public funds the portions of the Sykes Road here in controversy. We are of the view that the jury by its answers to Issues 7, 8 and 10, found all of the elements of an implied dedication of the Sykes Road to the traveling public, and an implied acceptance of said dedication by the county, and we think the jury's findings in each is supported by ample evidence. We think the great weight and preponderance of the evidence brings this case within the following applicable law: In 19 Tex.Jur. 2nd, page 201, Sec. 20, we find this statement of the Rule:

"If for a considerable period of time a landowner disregards his private in-

terest and, without objection, permits the public to use a strip of his land as a highway, he will generally be held to have manifested an intention to dedicate the strip to the public. In this situation he may not deny the implication that is raised by his acquiescence in the public use of his land."

At page 205, Sec. 22, we find this statement:

"The period of time of the public use is immaterial when the affirmative attitude or intention of the owner in allowing the public to use his property is clearly apparent."

At page 207, Sec. 24, we find:

"Cogent evidence of a landowner's intention to dedicate a way to the public is furnished when he permits the public authorities to grade, repair, or otherwise improve the way by virtue of their general control over public streets and highway."

At pages 211–212, Sec. 29, we find substantially this statement: That a dedication is accepted by public user, or by public authorities taking possession of, or assuming control over, the land offered, as by going on it and improving or repairing it. At page 217, Sec. 34, we find this statement:

"On acceptance, a dedication becomes immediately operative. At that moment the owner becomes divested of all rights in the property inconsistent with the purposes to which the land is devoted, and the public becomes vested with all rights that are consistent with the use of the property for that purpose."

We see nothing in this record to indicate that the appellees, or those under whom they claim, made any objection to the use of the Sykes Road by the public. In fact, Mr. Frost said, in effect, that he had never attempted to interfere with the public use of the Sykes Road, and that he had never put any gravel on it, and that he had done nothing to interfere with its use as a public road until he put a fence across it in 1958.

Our Supreme Court in Oswald v. Grenet, (1858) 22 Texas 94, made this statement of the Rule concerning dedication:

"A setting apart, or dedication to a public use, to be effectual, need not be by deed; nor need it be evidenced by the use of it having been continued for any particular time; it is enough, that there has been some clear, unequivocal act, or declaration of the proprietor, evidencing an intention to set it apart for a public use, and that others have acted in reference to, and upon the faith of, such manifestation of intention. If the act of dedication be unequivocal, it may take place immediately. *If there be no such act, it may be evidenced by an uninterrupted use; and that need not be for any particular time.* Eight, and even six years, have been held in England, time sufficient to raise the presumption of a dedication from user; but it will depend upon the particular circumstances of each case." (emphasis added) citing cases.

Evidence was tendered to the effect that the Sykes Road had been in existence and had been traveled and used by the public for 30 years or more, and Mr. Frost testified to the effect that he had traveled the road before he purchased the adjoining tract in 1946. The evidence is certainly without dispute that after the bond program was voted that it was maintained and improved by the County at great expense to the County, and Mr. Frost made no attempt to interfere with its use and improvement until he built a fence across the road in 1958. Surely, under the foregoing undisputed testimony the jury was justified in finding that there had been a dedication of the Sykes Road. We have previously said that the question of dedication was an ultimate fact issue, and that it is a controlling one in this case. See Dunn v. Deussen, Tex.Civ.App., 268 S.W.2d 266, n. r. e. In Brown v. Kelley, Tex.Civ.

App., 212 S.W.2d 834, the Fort Worth Court, in discussing dedication said:

"However, the theory of implied dedication carries with it the idea that the owner consented to the use of his land as a highway to the extent that the court will hold that he dedicated it to public use, whether by express words, overt acts, or even by such inaction on the part of the owner as would justify a conclusion that he intended to dedicate his land to public use."

Going back to the Grenet case, supra, our Supreme Court has not seen fit to change the statement of the rule there expressed. In Owens v. Hockett, 151 Tex. 503, 251 S.W.2d 957, our Supreme Court again gave its approval to the statement of the Rule it announced in Oswald v. Grenet, supra. It likewise gave its approval to the doctrine announced in Elliott, Roads and Streets, (2d Ed.) p. 121, wherein it says:

"If the open and known acts are of such a character as to induce the belief that the owner intended to dedicate the way to public use, and the public and individuals act upon such conduct, proceed as if there had been in fact a dedication, and acquire rights which would be lost if the owner were allowed to reclaim the land, then the law will not permit him to assert that there was no intent to dedicate, no matter what may have been his secret intent."

It approved the statement of the Supreme Court of Vt., in Abbott v. Mills, 3 Vt. 521, wherein it said:

"the act of throwing open the property to the public use, without any other formality, is sufficient to establish the fact of a dedication to the public; and if individuals, in consequence of this act, become interested to have it continue so, * * * the owner cannot resume it."

(Approved again by our Supreme Court in O'Connor v. Gregg, Tex., 339 S.W.2d 878,

Point 6). Our Supreme Court, in this opinion, also gave its approval to the doctrine stated by the Fort Worth Court in Brown v. Kelley, heretofore cited. Our Supreme Court again, in the case of O'Connor v. Gragg, supra, held that the question of dedication was one of fact to be decided by the jury. (Citing Dunn v. Deussen, Pt. 5, supra). We think under the foregoing authorities, and under the undisputed record, that the evidence is ample to sustain the jury's finding of dedication of the Sykes Road.

■ Did the Court err in failing to render judgment for the County establishing an easement for roadway purposes on the portions of the Sykes Road and the Rice Farm Road on the verdict of the jury wherein the jury found all the essential elements of the acquisition by the County and the public of such easement by prescription? We think it did. In this connection the jury's answers to Issues Numbers 1 through 5, and 7 and 8 relate to the Sykes Road, and have reference to appellees' predecessors in title. Issues 11 through 15, 17 and 18, relate to the Rice Farm Road. Perhaps we should state again that with reference to the Sykes Road we have under consideration two separated 1-mile segments along its entire length of 17 or 18 miles, and with reference to the Rice Farm Road two separated quarter-mile segments along its entire length of 5 miles. The evidence is without dispute that the County leveled and shelled the entire Rice Farm Road in 1939 or 1940, and that the County constructed all the Sykes Road, and it was re-built, widened, improved and shelled in 1942 or 1943; that thereafter the County continuously, without interruption, used its equipment and regularly maintained, repaired, bladed and graded each of these roads after each rain; that such improvements, maintenance and repairs were paid for with public funds of Chambers County, and that this continued to the time that this suit was filed. There is evidence to the effect that these improvements and repairs were made on these roads under a claim of the right of the County to do so.

(We think it is significant that Mr. Frost testified to the effect that there had never been a fence across the road to stop the traveling public from using it at will, and as a matter of right.) That since the construction of these roads by the County, and particularly since their improvements in 1946 and 1947, these roads have become main arteries of travel by the public. According to Mr. Frost's testimony prior to January 28, 1958, there had never been a fence or gate across either of said roads at any point, and not one member of the traveling public had ever been stopped or prevented from using said roads, and that the general traveling public had been able to traverse the entire length of both of said roads without interruption since 1942 or 1943, as a matter of right. It is true that Mr. Frost claimed that he had shelled most of the portion of the Rice Farm Road in 1944, but he admitted that he had not shelled it since, and that he had never put any shell on the Sykes Road or done any maintenance work on it at any point. As before stated, we think the jury in its verdict found each and all of the essential elements of the acquisition by the county and the public of an easement by prescription for roadway purposes over the portions of the Sykes Road and the Rice Farm Road, and we think the answers of the jury with reference thereto are supported by ample evidence. We think the verdict of the jury and the evidence tendered brings this cause under the doctrine announced in Phillips et ux. v. Texas & P. Ry. Co., 296 S.W. 877, (Tex.Com.App.) where we find the following statement:

"the public may by adverse use for the prescriptive period, which is ordinarily 10 years in this state, acquire the line of highway in a road though the counties have not recognized it as such."

In Evans v. Scott, 37 Tex.Civ.App. 373, 83 S.W. 874, we find this statement:

"The public's right of prescription to a highway is not dependent upon the recognition of that right by the mu-nicipal authorities of the county, but is acquired by adverse use for the time and in the manner prescribed by the rules of law * * *." Porter v. Johnson (Tex.Civ.App.) 151 S.W. 599, 601.

In 21 Tex.Jur. under Highway 617, Sec. 78, we find this statement:

"* * * the right of the public is not disproved by an official refusal to recognize the road, for the public's right of prescription to a highway is not dependent upon recognition of that right by the municipal authorities of the county, but is acquired by adverse use for the time and in the manner prescribed by rules of law."

Under the foregoing authorities it is clear that a refusal by the County to recognize the road, as well as the County's recognition of ownership in the landowner, will not affect the rights of the traveling public to acquire prescriptive rights by adverse user for the requisite period. In Ladies' Benev. Soc. of Beaumont v. Magnolia Cemetery Co., 288 S.W. 812, (Tex.Com.App.) we find this statement of the Rule as to prescription:

"In order to establish a right of way by prescription, it is necessary to show that an uninterrupted user of the way has been made by the public, under an adverse claim of right, for the statutory period of limitation. This adverse claim of right may be proved by circumstantial evidence, sufficient to sustain the conclusion, but it must, nevertheless, be proved in some way by legal evidence, else the alleged prescriptive right fails. The use of lands of another by the public as a roadway, with the acquiescence of the landowner, will not ripen into a prescriptive right, no matter what period of time such use may continue, unless the evidence shows, circumstantially or otherwise, that the use was by claim of right adverse to the land-

owner, of which adverse claim the latter has notice."

The foregoing doctrine was reannounced by our Supreme Court in Othen v. Rosier, 148 Tex. 485, 226 S.W.2d 622. In Dortch v. Sherman County, Tex.Civ.App., 212 S.W.2d 1018, we find this statement of the Rule:

"In order to prove prescription it is sufficient to establish that the general public used the road under a claim of right, and not by mere permission of the owner of the land, without interruption or any substantial changes for at least ten years." (Citing Robison v. Whaley Farm Corporation, 120 Tex. 633, 37 S.W.2d 714, 40 S.W.2d 52, opinion adopted).

In Boone v. City of Stephenville, Tex.Civ. App., 37 S.W.2d 842, (n. w. h.) this Court held:

"A right to use private property as a public thoroughfare may be acquired by prescription, but in order to do so it is necessary to show that an uninterrupted user of the way has been made by the public under an adverse claim of right for the statutory period of limitation. The use by the public must be with the actual or implied knowledge of the owner, adversely, under claim or color of right, and not merely by the owner's permission." (Citing cases).

In Weldon v. Quaite, Tex.Civ.App., 175 S.W.2d 969, n. w. h., this Court held:

"One of the essential qualities of prescription is that the use must be adverse; that is, that the use must have invaded some rights of the owner which he could have asserted by action, and must be of a character which negatives simply a permissive use or license."

In 19 Tex.Jur.2d 180, Sec. 1, we find this statement:

" * * * In the case of dedication the owner is presumed to assent to the use

he has voluntarily given over to the public; whereas in the case of adverse possession he is presumed at every moment to be hostile to the exercise of the rights that are usurped by the public."

It is our view that under the record here made, and the authorities cited, that the objections, if any there be, by the appellees to the use and travel by the public and to the improvements, repairs and maintenance by the county, could not, and did not, defeat the prescriptive rights claimed by the county, and that the acquiescence is established by proof and a jury finding that the use was continuous and uninterrupted. This record is without dispute that the County actually took over the dominion and control of the roads in question when Mr. Pinchback became County Engineer in 1945. That in so doing, it exercised complete control in the maintenance and repairs of each of these roads, and that in addition thereto the county had placed these roads in its bond program and passed a bond issue creating funds with which to maintain public roads in the County, and in so doing it expended large sums of money in the rebuilding and the maintenance of each of these roads and exercised complete control and dominion over them, and that such control was adverse to the appellees in this case who had full knowledge of what the County was doing. It is true that Mr. Frost testified that he made complaint to one of the workers on the Rice Farm Road, at one time, and that the worker told him in effect to see his boss, Mr. Pinchback, but he did nothing further about that. It is also true that there was some testimony to the effect that there were signs along the Rice Farm Road that it was a private road, but our view is that under the holdings of the Texas Courts that objections by the landowner and continued use of the roadway, as well as the maintenance and control thereof, in defiance of such protests simply have the effect of rendering the character of the user more hostile and adverse. The appellees contend that the County recognized appellees' title to the lands in question as

late as June 26, 1947. We do not think that the letter in question, or the correspondence in full of Mr. Marshall sustains this contention. Certainly he was not authorized to waive or put in jeopardy any rights of the traveling public. The first letter dated January 23, 1947 that he wrote Mr. Frost was on his own stationery, which stated: "A. W. Marshall, Attorney-at-Law, Anahuac Texas". We quote the pertinent parts:

"I am assisting Chambers County in securing the right-of-way for the new roads to be opened and taken over by the County, under our recent Three Million Dollar Bond Issue. Among other roads to be taken over is the North and South road extending along the common line between Section 105 and Section 95, and on the South and North from there. This road takes part of small tracts belonging to C. M. Frost, C. W. Frost and J. M. Frost, Jr., in Section 95, and each of these tracts are taken 1.74 acres of land. I am enclosing you two deeds covering these tracts for the parties to sign if they are willing to execute them for the new roads. *As I understand it, it is not so much opening a new road, but more of building up and shelling and black topping an old road that already existed there, but had not been officially taken over by the County."* (emphasis added).

In the last letter which does not bear a typewritten date, but bears the stamp "June 26, received", and a pencil notation, "Received by JM Jr 6–27–47", which said:

"Dear Mr. Frost: I have heard nothing from you in regard to the execution of the right-of-way deeds for the opening of the roads in the east part of the County. If it is money for the information that you desire on this or any such terms that you want to put in the right-of-way deed, I wish you would please advise me to that effect: or if you wish to consider with me further, I will take a trip to Houston and take the matter up with you. In the meantime Mr. Broussard is very anxious to have this right-of-way completed so that work can begin on these roads. Yours very truly, A. W. Marshall."

We see nothing in this correspondence of Mr. Marshall, who was acting as right-of-way agent for the County that waived any right the County had that it had acquired by prescription. The correspondence discloses that the County recognized it had no deed to the property, and that it was the purpose of the county to acquire a record title to the roads before expending bond money upon them. But if we be mistaken in this view, we think that appellees' contention passes out of the case, because it is certain that Mr. Marshall, as right-of-way agent for the county, could not and did not waive any right that the public had acquired in these roads. Moreover, the jury found that the recognition of title by the County was repudiated, and that notice of repudiation was given to appellees more than ten years prior to January 28, 1958. In all events, this question passes out of the case. The appellees contend that the County became the representative of the public, and acted for the public, and could claim or disclaim in the public's behalf, and that any use by the public is subordinate to its representative, the County, and that after the County recognized appellees' title, this precluded acquisition of an easement by prescription on the part of the traveling public by public user. We are certainly not in accord with this view. We must always bear in mind that with reference to prescriptive rights, the element of acceptance is not involved. Here we have a claim of prescriptive rights on the part of the County, based upon adverse use and exercise of dominion in making repairs and improvements of the roadways, and the control thereof. We also have a separate and independent claim of prescriptive rights on the part of the public, based upon its adverse use and travel of these same roadways. That leads us to say that the recognition,

if any, of Frost's ownership of the roadways in controversy by the County did not affect the rights of the traveling public to acquire by prescription an easement in the highways in controversy by adverse use for the requisite period of time. We think under the cases we have cited, that it is well settled that a lack of official recognition of the road by the public authorities will not destroy the claim of a public right-of-way by prescription. It is true we do not have here a situation of lack of official recognition. Here we have merely a contention by the appellees that by asking Frost for a deed of conveyance, and without consideration, the County recognized ownership in Frost, and that this destroyed the claim of prescription by both the county and the traveling public. We have previously stated, we are not in accord with this view. It is our view that the claim of the public to prescriptive rights is independent of, and not affected by any recognition or failure to recognize, or other acts of the County under the authorities here cited.

Certainly the jury did not have to believe Mr. Frost's testimony, but they were at liberty to accept or reject all or any part of any of the testimony tendered. We think there is ample evidence in the record to support the jury's finding of repudiation of the recognition of Frost's ownership and their finding of notice or repudiation to appellees between June 26, 1947, and January 28, 1948. During that period of seven months, in defiance of Frost's protests to Marshall against the maintenance of these roads, the County repaired, bladed and maintained them regularly after each rain, being every two or four weeks, and the County Engineer so testified. Thus the County road maintainer and County crews were seen on these roadways during that seven-month period between seven and fourteen times. Such control and dominion over these roadways exercised by the County, in defiance of Frost's objections to Marshall, was clearly a repudiation of recognition of Frost's ownership, if under this factual situation the county ever recognized his ownership of these roads. Testimony of the County Engineer regarding regular maintenance and repairs was corroborated by the testimony of witnesses Otter, Hay, Work and Winser, Jr. Each of these witnesses saw the County road equipment and County work crews on these roads during that seven-month period performing repairs and maintenance regularly. The jury chose to believe the testimony of the County Engineer and other witnesses who corroborated his testimony. But appellees contend that under the authorities of Othen v. Rosier, supra, and O'Connor v. Gragg, supra, and cases there cited, that the use of the roadway during this time by appellees and their tenants defeats the public's right of prescription on the theory that since the owner of the land in each instance used the roadway along with others prevented the use of the road by the public from becoming adverse, because the use was not exclusive. We think the case at bar is easily distinguished from the factual situation in each of these cases, and the cases there cited. First of all, in each of the foregoing cases, there was a suit to establish a private easement in behalf of the plaintiff. We think another distinction lies in the nature and character of the easement itself, and the purpose for which it was being used. In the O'Connor case, everybody used the roadway there in controversy for the same purposes as the Graggs, which was to get the paved road north of all the land involved. This was the exact or similar situation in the Othen case, and in the cases cited in the Othen case. Here the roadways in controversy consisted of separated 1-mile and quarter-mile interior segments of roads, and all portions of which, both within and outside of the Frost tract, looked exactly alike. The roadways here involved were not used by everyone for the same purpose. This is particularly true with respect to Sykes Road, which was used by the general traveling public to get to State Highway 124 on the east to the Farm-to-Market Road running south from Anahuac on the west, and

also to get to and from all other roads, including the Rice Farm Road which intersects the Sykes Road. However, we think a more important distinction lies in the fact that the County here used and exercised dominion and control over the roadways in controversy by improving, repairing, and maintaining them for the use of the traveling public, whereas, in the O'Connor case no work was done on the road by the county. The use of the roads here by appellees was merely for purposes of traveling over them, and as members of the general public, appellees did not use these roadways for the same purposes as the appellant, and the overwhelming preponderance of the evidence is that from and after 1942 improvements, repairs and maintenance of these roads were made and performed exclusively by the County. Mr. Frost admitted that he had never put any shell or done any maintenance work on the Sykes Road at any point, and that since 1944 he had not shelled the Rice Farm Road. The Supreme Court in the O'Connor case pointed out that there was no evidence which even tended to show a right or claim of right of either Graggs or the public to use the roadways to the exclusion of petitioners' right to use the roadway involved. Here there is an abundance of evidence that the County and members of the public were using these roads under a claim of right, and it is also true that the witnesses for appellees testified to the effect that appellees objected to the improvements, repairs and maintenance of the roadways by the appellant, and the facts and circumstances, as well as the testimony of the County Engineer show that these improvements and repairs were performed by the County under a claim of right to make and perform such improvements. Not only did the County claim the exclusive right to perform such work on the roads as public County roads, but the overwhelming preponderance of the evidence shows that from and after 1942 such use and exercise of dominion and control over these roadways by appellant, in making such improvements, repairs and in performing such maintenance, was exclusive. Appellees have cited no authority involving a fact situation as we have here, or similar thereto. Here the suit is brought by the County where the County claims prescriptive right in behalf of itself and the traveling public, based upon improvements, repairs and maintenance of the roads by the County and upon use and travel by the public. It is the County's contention that use of the road by the owner, as a member of the general public, under the factual situation presented by this record will not and does not prevent the use from being exclusive, and will not defeat prescriptive rights. We are in accord with this view. As this Court stated in Weldon v. Quaite, supra:

"One of the essential qualities of prescription is that the use must be adverse; that is, that the use must have invaded some rights of the owner which he could have asserted by action, and must be of a character which negatives simply a permissive use or license."

The jury in its verdict found that the use made of the roads was not permissive. In Ruling Case Law Vol. 9, page 781, we find this statement of the Rule:

"The prevailing rule is that where the claimant has shown an open, visible, continuous and unmolested use of land for the period of time sufficient to acquire title by adverse possession, the use will be presumed to be under a claim of right, so as to place upon the owner of the servient estate, in order to avoid the acquisition of an easement by prescription, the burden of rebutting this presumption by showing that the use was permissive."

Mr. Frost admitted that the public used the road at will, and as a matter of right. It is true that there is some evidence in this record to the effect that the appellees objected to the use of these roads, and the jury so found. But we are of the view that the jury's finding that there were objections to the use is merely evidentiary, and not a controlling issue in this cause, and

strengthens the jury's verdict wherein it found that the use of the roads was adverse to the appellees and under a claim of right, and that by reason thereof the findings on objection pass out of the case.

Finally, we are of the view that the Court erred in overruling the County's Motion for Judgment on the verdict of the jury favorable to it on its theory of implied dedication with respect to the portion of the Sykes Road involved, and on the County's theory of prescription with reference to both the Sykes and Rice Farm Roads. If we could reach appellant's 5th, 6th, 7th, 8th, 9th, 10th and 11th Points, we would hold that the damages assessed by the jury in the trial court are without support in the evidence, and that the answers of the jury with reference to damages is so against the great weight and preponderance of the evidence as to be wrong, and such view would require a reversal and remanding of said cause.

Because of the views expressed, the judgment of the Trial Court in the title action is reversed and judgment is here rendered that the County recover from appellees an easement and right-of-way for highway purposes over each and all the tracts and parcels of land described in the judgment, and it is decreed that such easement and right-of-way is established in favor of the County and against appellees by implied dedication with respect to those portions of the roadway known as Sykes Road, and by prescription with respect to all the roadways involved in this suit, and that appellees, and each of them, be perpetually enjoined from interfering in any manner with the County's use and enjoyment of such easement and right-of-way. Judgment is further rendered that the Clerk of the District Court of Chambers County is directed to issue his check payable to Chambers County in the sum of $30,000.00 deposited with the District Clerk of that County as a cash bond. It is further decreed that all costs of appeal are taxed against appellees. The costs in the Trial Court are taxed against Chambers County.