## FOWLER v. MATTHEWS et al.
### No. 9623.

Court of Civil Appeals of Texas. Austin.
June 18, 1947.

Rehearing Denied July 9, 1947.

Wm. Yelderman, of Austin, for appellant.

Perry L. Jones, County Atty., of Austin, for appellees.

McCLENDON, Chief Justice.

Suit by I. D. Fowler against the members of the Commissioners' Court of Travis County, in their official capacity, seeking: to nullify an order of that court of September 14, 1946, which found that a roadway extending through his property was a third-class public road; to remove cloud cast by that order upon his title; and (by trial amendment) a decree declaring the road to be "a private road over which the public had no right to travel." At the conclusion of plaintiff's evidence the court sustained a motion by defendants for judgment upon a finding "that the said road had been traveled by the general public, adverse to plaintiff's interest, for a period of more than ten years." Plaintiff has appealed, urging the following three points of error:

1. That the description of the roadway in the order "is so vague and indefinite that it furnishes no means of locating the road upon the ground."

2. That there was no road by prescription because the "evidence conclusively shows that the roadway as used is 1,000 yards distant from the described road."

3. That the evidence conclusively shows "that the use of any roadway over the land of appellant was over a private road built for his own convenience and the use of said private road by any portion of the public was not adverse to that use."

The full text of the order reads:

"In Commissioners' Court, Travis County, Texas. Third Class Road—Bee Cave Road North to McNeil Cemetery.

"On this the 14th day of September, 1946, came on to be considered by the Commissioners' Court of Travis County, Texas, the status of the following described road in Travis County, Texas:

"Beginning at a point on the Bee Cave Road One (1) mile, more or less, west of the Rob Roy Ranch house located on the Bee Cave Road, said road extending in a Northerly direction, crossing Eanes Creek, for a distance of approximately Three (3) miles to a point near McNeil cemetery; thence Westerly for a distance of fifteen one-hundredths (.15) of a mile; thence Southwesterly for a distance of One and four-tenths (1.4) mile; thence South for a distance of One and two-tenths (1.2) mile to a point on the old road going to the Cameron Ferry; thence along the said Cameron Ferry road Southeasterly five-tenths (.5) of a mile to the Bee Cave Road approximately ninety-five one hundredths (.95) of a mile West of the point of beginning.

"And it appearing to the Commissioners' Court that this road has been used by the public for a great many years and it further appearing that this road was in existence prior to 1932 and in that year was surveyed as a County Road by the Travis County Engineering Department and placed by said department on a road map of Travis County. Therefore, it is the finding of The Commissioners' Court of Travis County, Texas, that the above described road is a public County Road of Travis County, Texas, and has been for many years."

It was stipulated that the only order of the court "in reference to any public road along the route designated in the said matter is the order of the Commissioners' Court passed in 1932, directing the county engineer to prepare a road map of Travis County; and that in compliance with said order * * * he did mark out on the road map of Travis County *a route along the general route designated in the later order here complained of,*" and that this map was approved by the court on March 14, 1932. (Emphasis added.)

The first point was not raised in any way in the trial court. The pleadings assume and the evidence clearly shows,

that there was no question as to the identity of the roadway or its actual location on the ground. The petition alleges that about 3 miles of the road "described in the order * * * crosses" his land, and that no public road exists "along the route set out by the order across plaintiff's land." The only claim regarding the description of the road was that involved in the second point, to the effect that a portion of the roadway through plaintiff's land, about 1½ miles in length, as described in the order and on the county road map, followed the course of an old roadway which had since been abandoned for more than ten years, and a new section was constructed by plaintiff in 1932 or 1933, which at one point was about 1,000 yards east of the abandoned section of the old roadway. This subject we discuss later. We overrule the first point.

We will consider points 2 and 3 together, since the pertinent evidence is largely interwoven. Other than the order and stipulation above, and a rough plat of the roadway from the initial point in the order to the cemetery, made by Mr. Fowler from memory, the only evidence in the record consists of the testimony of Mr. Fowler and two witnesses called by him. It will be noted that the road described in the order is in the form of a loop, or as some witnesses called it, an elbow, approximately 6¼ miles long, the two termini on the Bee Cave Road being only .95 of a mile apart. The cemetery was located almost equidistant from each terminus (about 3 miles from one and 3¼ miles from the other). This cemetery had been in existence for over 60 years, and contained some 60 graves. Mr. Fowler's property consisted originally of a 200-acre tract fronting on Lake Austin on the north and extending to within about 200 yards of the Bee Cave Road to the south, purchased by him in 1931. The plat is, as he described it, a rough one, not drawn to scale, and the points of the compass are not given. Proceeding northward from the Bee Cave Road the gate to his premises was reached at about 200 yards. Some 200 or 300 yards farther the road forks. The right or east fork is what he terms his private road, or "New Road 1933"; the left fork is marked, "County Road 1932 Abandoned 1933."

These two forks join at a point opposite the Kreisle residence. The road proceeds thence westerly, crossing Eanes Creek at a short distance, then after passing Mr. Fowler's residence, turns southwesterly a short distance to the cemetery. Somewhat east of the Kreisle residence a private easement is shown extending from the "New Road" to Lake Austin. This easement is not here involved. Beginning at the east line of the easement and proceeding eastward three tracts are designated in the following order: "Fred Adams," "Wolf," and "Charlie's Camp," the last containing 40 acres. The longest distance given between points in the two forks is 1,100 yards. The following is from Mr. Fowler's testimony, substantially stated except where quoted: At the time of his purchase there was an old road which followed the course of the west fork. There was then no road along the route of the "New Road" fork. This old road was in very bad condition. It took a truck two hours to haul his furniture over it. In 1932 the county engineer came over this old road in a Ford car surveying it by means of a compass on his radiator and a speedometer. This was the road placed on the county map. Late in 1932 or early in 1933 he laid out and cleared the roadway over the "New Road" fork, engaging the county commissioner to do some work with county grader and bulldozer, for which he and Kreisle agreed to pay $25 each; however, his money was refused by the county but Kreisle's was accepted. Charlie's Camp, owned by Charlie Robinson, was operated as a camp site catering to the public generally, selling cold drinks, renting boats, furnishing fishing equipment, and renting camp sites at 50 cents per car. The public generally patronized it, and it was advertised by signs along the route of the "New Road." This road provided its only ingress and egress. The road from the New Road to Charlie's place was from the south end of the private easement over a roadway across the Adams and Wolf tracts. "I gave him permission to use it (the New Road) privately, for himself only, because he had no other way of getting out; but we never gave any particular people permission for the public to cross over the road or to him, either, and we offered him,

across Mr. Adams' place, offered him a key to the gate to go in and out, but he didn't want that; he wanted the gate open." Fowler never gave Charlie any permission to use the road for public purposes. "I have objected to that all the way through." "It is used as a public road to get down to Charlie's Camp." "It has been doing it ever since I built that new road, over my objections." "People in town that have dates here in town who want to go out and have a good time and take their dates with them go down there." "Q. It is a public place—I suppose if I paid him fifty cents I could go down there? A. Oh, yes, that is according to his advertisement; but that is one thing I am trying to stop." He had sold building sites near the lake to some 32 or 33 families (dates not given) and of these he named 17 who had built homes, costing from $5,000 to $15,000 each. In each deed an easement was given over the New Road, and where there is no lake frontage, an easement for passage to the lake. There was also in each deed a restriction against use for other than private purposes. He had never placed any barrier across the road. "That would be impractical because I have 50 or 60 people that have a right of ingress and egress over it, and I couldn't put a barrier in there and not permit somebody to go in there, when they have a right to go over it." "Q. And you have just stated that the public has been using this road ever since you put it in in 1932 or 1933, but over your objection? A. Absolutely." "The only place I have tried to stop them and tried to turn them back was on my private easement down to the lake." He had put up signs from time to time stating the roadway was private; but they had been torn down each time. With regard to the county's working the road he testified that this had been done by every county commissioner since 1932. However, in each instance he either paid or offered to pay for the work. "I would have paid them all of it except they felt like, they expressed themselves, that they should help out in building that, because we have more than two miles of telegraph lines—I mean of light lines and telephones —that were put in there, and sometimes 35 or 40 cars hauling materials down there

to build that, and the property valuation for taxes has increased a hundredfold, and the Commissioners had expressed themselves, a part of them, that they felt like they should help those people out down there some in keeping up the road, hauling heavy material over it, and gasoline tax, and such as that, and, therefore, what they have done on that they did it on their own accord." When he purchased in 1931 there was a ten-foot gate where the road entered his property, which was maintained until a few years back when the property between him and the Bee Cave Road was fenced for the first time and a gate and cattle guard placed at the entrance on the Bee Cave Road. Since then the Fowler gate has been removed. The road west from the New Road to the cemetery was very seldom traveled. He made no objection to its travel by anyone going to the cemetery.

The two other witnesses were Mr. Allen and Mr. Thurman. Mr. Allen lived on Lake Austin a few miles west of the Fowler property. When he was 4 years old his father bought a tract adjoining that of the Fowler tract, and he had lived in the vicinity ever since, with the exception of about 6 years. It is a little difficult in some respects to follow his testimony, which is also true with reference to that of Mr. Fowler and Mr. Thurman. But after a careful perusal of his testimony, the following clearly appears. The road over the "New Road" fork was originally built some years prior to 1883 by a Mr. Moore, who owned property which required it as an outlet. Later Mr. McNeil bought the Fowler tract and used the road. These two neighbors had a controversy over Moore's goats getting into McNeil's property, and Moore thereupon closed the roadway to McNeil; who then constructed a roadway up the east side of Eanes Creek. In 1883 McNeil killed Moore in a quarrel over the goat trespassing controversy, and shortly thereafter moved out of the State. This roadway which McNeil built, and which apparently is the one Fowler stated was traveled over by the county engineer in 1932 and put upon the county map, is the one Allen states was built by McNeil. As to this road Allen testified that it was "a little old road around by the hollow that I think shows it was used

for awhile and was discontinued. It would be hard for you and me to ride up that way horseback." As to the road over the "New Road" fork, he testified unequivocally "it is approximately the same road it was sixty years ago, practically." It had been greatly improved by Fowler, but followed the same course. "No, sir; those old roads was abandoned, but never this one. This got to be the main road." Upon this specific point there is no question as to the positive character of his testimony. He detailed an incident 30 years ago when a Ford car traveled over the road at from 40 to 45 miles an hour, in a physician's emergency visit. The "New Road" was over the same route as the one Mr. Moore built; "it has always been the main road; that other road has trees on it which would make good posts." As to this road he testified that the public used it. "Why, there was men over the line that never traveled any other road. The neighborhood was a little thinner." His testimony covers a continuous period of practically 60 years. "Mr. Fowler is a man I like and I visit him occasionally. I always go down that road to the graveyard and up the new road. They are both good roads."

The testimony of Mr. Thurman differs only from that of Mr. Allen, in that he had moved away from the neighborhood in 1914 to Oak Hill, which was on the Bee Cave Road some 4 or 5 miles nearer Austin. He had lived on the place where Mr. Allen lived for over 50 years. His testimony is equally emphatic as that of Mr. Allen that the "New Road" improved by Mr. Fowler followed substantially the course of the old road, which had existed some 60 years ago, and which was always traveled indiscriminately by the public.

 A firmly established doctrine in this State, as well as in other American Jurisdictions, is that a public (as well as a private) roadway easement may be established by prescription. 21 Tex.Jur., p. 546, § 20; 39 C.J.S., Highways, § 3, p. 921; 25 Am.Jur., p. 346, § 11; and authorities cited in abundant support of each of these texts. It is also generally held that the longest limitation period provided by statute in real estate actions, as well as the general principles applied to such actions, are by analogy applied to acquisition of such easement by prescription. This period in this State is 10 years, and generally the elements required to support limitation are likewise applied to prescription. These elements are possession by the claimant which as to the owner is adverse, under a claim of right, exclusive, continuous and uninterrupted for the statutory period. There is this essential difference between acquisition of title to land by limitation, and that of a prescriptive right to an easement, whether public or private, over land. In the latter case user is substituted for possession. The owner is not excluded from possession generally, nor from a user not inconsistent with that of the public or private claimant. The hostility and exclusiveness relate to the owner's absolute and unqualified right of dominion over his property. Appellant contends that the user in this instance was not adverse or exclusive because the roadway was used by himself as well as the public during the prescriptive period; citing Sassman v. Collins, 53 Tex.Civ.App. 71, 115 S.W. 337, error refused. At the time that case was decided the refusal of a writ of error signified only that the application presented no reversible error. The opinion was not approved, but only the decision and consequently the holdings essential to support it. As pointed out in Foster v. Patton, Tex.Civ.App., 104 S.W.2d 944, error dismissed C.J., this specific holding was not essential to the decision. Moreover it related to a claim of private easement, and as such it is out of harmony with the generally accepted rule. Exclusive use "does not mean that no one has used the way except the claimant of the easement. It simply means that his right to do so does not depend upon a similar right in others." 17 Am.Jur., p. 976, § 64. "The use may be exclusive in the required sense even though it is participated in by the owner of the servient tenement, or by the owners of adjoining land." 28 C.J.S., Easements, § 15, p. 659. "The mere fact that the owner of the land also passes in the same place or along the same line would not seem in itself sufficient to show that the user is permissive." 2 Tiffany on Real Property, p. 2048. These quotations relate to private easements, in which the right is in the indiv-

idual as distinguished from the general public. "The rule generally, if not universally, followed is that use of a right of way in common with the public is regarded as negativing a presumption of grant to any individual user." 17 Am.Jur., p. 976, § 64. In case of a public easement manifestly the use by the owner, along with other members of the public, would not prevent the public user from being adverse or exclusive in the legal sense. It is only necessary that the public user be continuous for the requisite period and be in derogation of the rights of the owner, as distinquished from a permissive right.

"In order to create a highway over lands by prescription the public user must be exclusive; that is, it must be such as to show a claim of right to use the land as a highway *to the exclusion of any individual right of the owner inconsistent therewith."* (Emphasis added.) Phillips v. Texas & P. R. Co., Tex.Com.App., 296 S.W. 877, 881.

■ And this hostility and exclusiveness may be inferred from circumstances as well as established by direct proof.

For a very interesting discussion of the Phillips and other cases upon the topic "Does Public User Give Rise to a Prescriptive Easement or is it Merely Evidence of a Dedication" will be found in VI Tex. Law Rev., p. 365, in which the author takes issue with the generally accepted doctrine of prescription. For all practical purposes it would seem unimportant whether the right be named a prescriptive one or one acquired by implied dedication. As applied by the courts, the elements under either appellation are the same.

■ The evidence above detailed is clearly sufficient to support a finding of a public road by prescription, if in fact it does not conclusively show such public road. It evidences a continuous use of the road over substantially the same course for a period of over 60 years; its delineation on the county road map, approved by the Commissioners' Court, for over 14 years; working the road from time to time by the county and recognition of obligation to property owners of duty of county to work the road; and hostility and exclusiveness of the public use in the continuity thereof over objections of appellant; and the futility of his efforts to prevent such use. This holding disposes of the third point.

As to the second point: The county map was not offered in evidence, and the first call in the order: "extending (from the Bee Cave Road) in a northerly direction, crossing Eanes Creek, for a distance of approximately Three (3) miles to a point near McNeil Cemetery," would fit either fork of the road. This fact, taken in connection with the recitation in the order that it "had been used by the public for a great many years," and the testimony of Allen and Thurman that the route over the east fork had been the main road for over 60 years and that the west fork was only temporary about 1883, and was shortly abandoned, and Mr. Fowler's testimony that the west fork had not been used since 1932 and had been impassable for over ten years, would strongly support a finding that the east fork was the route referred to in the order. But even were Mr. Fowler's version conceded to be correct the judgment is supported upon either of two theories:

1. The public rights in the east fork ripened into an easement by prescription under the user for over 14 years since 1932.

■ 2. If there had been a change in course in 1932 from the then west fork route to a new route via the east fork, this simply amounted to a rerouting or change of location of the existing roadway. We recently had occasion to examine the question of change of route of a private easement by implication, in the case of Carleton v. Dierks, Tex.Civ.App., 203 S.W. 2d 552. It was there held that: "It is a rule of general application that the location of an easement 'may be changed with the express or implied consent of both parties, and an estoppel to claim a former location to be the true one arises from acquiescence in a change'. 17 Am.Jur., p. 988, § 87." Other supporting authorities are cited. This rule is equally applicable to a public easement. "A land owner who has acquiesced in the relocation of a road and stood by while the public authorities ex-

pended public funds in the improvement of the road as thus located is not in a position to question the identity of the line of travel; and a change of location made by the owner of the land for his own convenience after the right of the public in the road has become established through user does not defeat such right." 39 C.J.S., Highways, § 6, p. 925.

The trial court's judgment is affirmed.