**SEAWAY COMPANY, Inc., Appellant,**

**v.**

**ATTORNEY GENERAL of the State of Texas et al., Appellees.**

No. 13921.

Court of Civil Appeals of Texas.

Houston.

Jan. 30, 1964.

Rehearing Denied March 5, 1964.

Louise C. Rowen, Herminie Hanson, Galveston, De Lange, Hudspeth & Pitman, Albert J. De Lange, C. M. Hudspeth, Eugene J. Pitman, M. Marvin Katz, Houston, for appellant.

Will Wilson, Atty. Gen., Texas (when suit was tried and argued on appeal— Waggoner Carr, present Atty. Gen.), Ben M. Harrison, J. Arthur Sandlin, Joe A. Osborn, Asst. Attys. Gen., Austin, Jules Damiani, Jr., Criminal Dist. Atty. of Galveston County, Galveston, for appellees.

BELL, Chief Justice.

This case involves the question as to whether the people of Texas have an easement on, over, along and across a portion of the beach along the Gulf of Mexico on Galveston Island giving them access to the State-owned seashore and waters of the Gulf. The easement asserted in appellees' petition, found by the jury's verdict, and established by the court's judgment based on the jury verdict, encompassed an easement in the public to use the area of the land adjoining the waters of the Gulf of Mexico from the line of mean low tide to the seaward side of the line of vegetation for travel and camping and to make use of the area so the members of the public could fully pursue their rights to swim, fish and boat in and on the Gulf waters.

The 56th Legislature of Texas at its Second Called Session of 1959, enacted what is popularly known as the "Open Beaches Bill." Acts 56th Legislature of Texas 1959, 2nd Called Session, Chapter 19, p. 108. This Act is carried in Vernon's Annotated Civil Statutes as Article 5415d and will hereafter be referred to in this opinion as Article 5415d. This Article, among other things, declared it to be the public policy of this State that the people of the State should have the free and unrestricted right of ingress and egress to and from the *State-owned* beaches bordering on the seaward shore of the Gulf of Mexico or such larger area extending from the line of mean low tide to the line of vegetation *in the event the public has acquired a right of use or easement to or over such area by prescription, dedication, or has retained a right by virtue of continued right in the public.* The Article made it an offense against such public policy for anyone to obstruct the way of ingress and egress or the use of the beaches. The Attorney General of Texas, a County, District, or

Criminal District Attorney were given authority to bring suits on behalf of the people of Texas, and it was made their duty to do so, to require removal of any obstructions that may interfere with such right of ingress and egress.

While the above is not all of the Act, it is all that need be noticed at this time.

Pursuant to the authority conferred and the duty enjoined the then Attorney General of Texas, the Honorable Will Wilson, and the Criminal District Attorney of Galveston County, the Honorable Jules Damiani, filed suit against appellant, asserting it had owned, controlled and was maintaining barriers from the line of vegetation seaward beyond the line of mean high tide at three defined positions, two being on projections of specified lot lines of the West Beach Addition and one being a projection of the east line of Sea Island Addition. Both additions are in Section 12 of the Jones & Hall Grant in Galveston County. Prayer was that appellant be required to remove the barriers and be enjoined from erecting others seaward of the seaward side of the vegetation line which would interfere with the use by the public of the area seaward of the line of vegetation.

The petition asserted that appellant was claiming ownership of the surface of the area where the barriers were located, but that whatever rights it had were subordinate and subject to the right of use of the people as a means of access to and the full use and enjoyment of the sovereign-owned shore and waters of the Gulf of Mexico for swimming, fishing, boating, camping and as a public way for vehicular and pedestrian travel between the City of Galveston and the west end of Galveston Island. The bases of the assertion of these superior rights in the people are these:

1. Before, at and continuously since the Jones & Hall Grant on November 28, 1840, the area between the vegetation line and line of mean low tide has been used by the people without overt challenge, question or interruption until the barriers complained of had been erected and such rights thereby became a part of our honored custom and common law.

2. At and before the Grant such area was dedicated as a public way, and was so designated on the official maps of Texas and the grant to appellant's predecessors in title was necessarily subordinate to such rights in the people.

3. For 25 years next preceding the erection of the barriers public funds had been expended by Galveston County in maintaining the area free of debris and other obstructions, which fact was known, or, in the exercise of reasonable diligence, could have been known, to appellant and its predecessors in title, and they have knowingly accepted the benefits of such expenditures and are estopped from denying such rights in the public.

4. The people by adverse use of the area for more than 10 years next preceding the erection of the barriers have established an easement by prescription.

5. There has been express dedication of the beach area seaward of West Beach Addition.

6. Subsequent to the making of the Jones & Hall Grant the long use of such area by the public and the long acquiescence by appellant and its predecessors in title reflect that the area has been dedicated to public use.

The barriers were, therefore, alleged to be public nuisances and against public policy.

The effect of appellees' petition is to assert an easement in the public covering the area between mean high tide and the seaward side of the vegetation line based on dedication, prescription and continuous right in the public.

The appellant's answer contained, in addition to pleas in abatement and exceptions not here necessary to notice, a general

denial, special denials, and affirmative claims that title to the land on which the barriers were located had passed out of the State over 100 years ago and the barriers were on land belonging to it, and it also pled the 3, 5, 10 and 25 year statutes of limitation.

The court's charge defined the "beach" as the "area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico." It defined the "Line of vegetation" as "the extreme seaward boundary of natural vegetation which spreads continuously inland." This is essentially the definition given in Article 5415d.

The jury, in response to special issues, found as follows:

1. The beach along Section 12 of the Jones & Hall Grant since a time before November 28, 1840, the date of the grant, had been continuously, as a matter of common practice, used by the public, individually and collectively, as a public way and for use in connection with fishing, swimming and camping.

2. That subsequent to the date of the grant the beach along the west one-half of Section 12 of the Grant had been dedicated for use by the public by appellant's predecessors in title.

3. That at and before the time of the Grant the Republic of Texas had dedicated such beach for use by the public.

4. That the public had exercised peaceable, adverse and continuous use of the beach for a consecutive 10 year period during a period from November 28, 1840 to 1947 for swimming, fishing and camping.

5. That the public had exercised peaceable, adverse and continuous use of the beach for a consecutive 10 year period during the period from November 28, 1840 to the year 1947 as a public way for pedestrian and vehicular travel.

6. That the public had exercised peaceable, adverse and continuous use for more than 10 years next preceding the erection of the barriers for swimming, fishing and camping.

7. That the public had exercised peaceable, adverse and continuous use for more than 10 years next preceding the construction of the barriers as a public way for pedestrian and vehicular travel.

8. That for more than 25 years next preceding the erection of the barriers public funds had been expended by Galveston County with the knowledge and acquiescence of appellant's predecessors in title in maintaining the beach free of debris and other obstructions.

9. The beach had remained in substantially the same geographical position since the time of the Jones & Hall Grant.

10. That the uses by the public were not permissive only.

11. That the mean high water line has not advanced landward since July 31, 1931.

12. That since November 28, 1840 there has been no landward advance of the mean high water line in the area used as a public way.

13. There has been no net erosion along the shore of the Gulf of Mexico.

14. There has been no advance landward of the mean high water line in the area used for fishing, swimming and camping.

15. There has been no landward advance of the mean high water line since dedication by appellant's predecessors in title.

16. There has been no net erosion since dedication by appellant's predecessors in title.

17. There has been no net erosion since dedication by the Republic of Texas.

The jury also found the barriers maintained by appellant interfered with use by the public of the area from mean low tide to the vegetation line.

It should be noted that this particular suit does not involve the whole of what is called "West Beach" from the City of Galveston west to the western end of Galveston Island. It involves specifically only the area seaward of the seaward side of the vegetation line along Sea Isle and West Beach Additions belonging to appellant.

■ In popular understanding the beach lying east of the seawall is called "East Beach" and that lying west is called "West Beach." When we use the term "beach", unless we otherwise specify, we mean the area between mean low tide and the seaward side of the vegetation line. The "line of vegetation" is defined in Section 3, subd. a of Article 5415d and it is stated to be "the extreme seaward boundary of natural vegetation which spreads continuously inland." There are in this section directions for determining the location of the line of vegetation in a particular area where such is not clearly shown on the ground by tying it in by measurement and survey to the nearest vegetation line located on the ground. We need not, however, notice this feature of the Act because in the area involved in this suit there is a well defined line of vegetation located on the ground. In using the term we are adopting the definition given in Article 5415d because it is the area involved in this suit. We are not unaware of appellant's contention that the beach is only that area between mean low tide and mean high tide and that public rights are restricted to such area. It seems not to be disputed that the Jones & Hall Grant was one made after the adoption of the common law by the Republic of Texas and, therefore, if it carried to the waters of the Gulf of Mexico the State-owned beach would end at the line of mean high tide. This statement is subject to the appellees' contention that it is not shown that the grant carried to the waters of the Gulf and even if it did there was the implied limitation that the title obtained was subject to the right of ingress and egress in the people of Texas to the State-owned shore.

On November 28, 1840, the Republic of Texas issued its patent to Levi Jones and Edward Hall to 18,215 acres of land on Galveston Island. This grant covered all of Galveston Island except the land covered by the Menard Grant covering the east portion of the Island.

A specific description is given but we need notice only a portion of it. It begins at a cedar post *on the Gulf of Mexico* which is stated to be the southwest corner of the M. B. Menard Grant and the southeast corner of Section 1 of a survey made by Trimble and Lindsay. From this point are these specific calls:

"Thence S. 55½° W. with the said Gulf shore 218.35 chs; thence S. 58° W with said Gulf Shore 130 chs; thence S 62° W 100 chs; thence S 61° W 170 chs; thence S 58° W 144 chs; thence S 57° W 316.58 chs; thence S 56° W 130 chs, thence S 55¼° W 80 chs; thence S 54° W 182 chs; thence 52½° W 110 chs; thence S 49° W 124 chs; thence S 72° W 23 chs; thence N 82° W 17 chs to the extreme west end of Galveston Island."

These specific calls constitute what is commonly known as a meander line. Following the above calls there is an express call for a meander of the Bay followed by specific calls that amount to a meander line which carries to the northwest corner of the Menard Grant. Then there is a call "thence to the point of beginning."

On February 8, 1854, the Legislature of Texas passed an Act confirming title to the lands described in the patent and disclaiming any interest in the lands described therein.

■ The effect of the patent, though there was no express call to "meander" the Gulf Shore, was to convey the lands to the shore which under this common law grant would be the line of mean high tide. It is suggested by the appellees that since the field notes did not specifically call for the

Gulf of Mexico line to "meander" the Gulf shore but did call for the "Bay" line to meander the Bay, there is no showing that the survey went along the Gulf Shore. It is also suggested that there could be a vacancy between the Gulf Shore and the survey and that the burden is on appellant to prove title passed out of the State.

■ The answer to such suggestion is that the appellees' pleadings did not assert title in the people on the theory that the patent did not go to the shore. This was no suit by the State to recover title so the cited cases holding that in a suit by the State to recover title the State need only show the land lay within the State and the burden then shifted to the claimant to show title had passed out of the State. The effect of the pleadings was to admit appellant and its predecessors had title but to assert ownership was subject to an easement in favor of the public such easement being acquired in the manner above stated. Our holding is that title passed from the State to appellant's predecessors in title.

■ One theory of recovery of the easement by the appellees, and which is one basis of the court's judgment, is that traditionally the sovereign has held the seashore as trustee for the use of the people and any conveyance made by the State would be subject to the right of the people to use the seashore and this includes the right of ingress and egress. Too, it was found by the jury, and such finding is supported by sufficient evidence, that the Republic of Texas, prior to and at the time of the grant, had dedicated the beach for use by the public. However, even if this be true the Republic of Texas at the time of the grant was, as sovereign, owner of the beach and as such owner had authority to convey fee simple title. Mayor, etc., of City of Galveston v. Menard, 23 Tex. 349. There was no law with which we are familiar which restricted the power of the President of the Republic who signed the patent to convey fee simple title to the line of mean high tide. In addition to the patent, there was the con-

firmatory Act which confirmed title in the patentee and its successors in title. Act of February 8, 1854, IV Gammell's Laws of Texas, pp. 125–126. It would no doubt have been good policy for the Republic to have reserved the right of ingress and egress so the people could more effectively enjoy the State-owned seashore and waters, but the plain language of the grant shows the Republic of Texas did not do so. We may not imply such a reservation in the face of the language of the grant even though there is evidence that there was a road down the beach at the time of the grant. The grant as made by the sovereign must be upheld just the same as if it were a controversy between two persons. The sovereign must fully honor its valid conveyances and contracts.

■ We do not know that we clearly comprehend the appellees' position that the judgment can be upheld on the theory that the use of the beach by the public has become a part of our tradition and common law and the easement exists by reason of continuous right in the public. We suppose they seek to have us hold that the seashore is held in trust by the sovereign at common law for the people and to enjoy it there must be a means of egress and ingress to enable them to enjoy such use and therefore the sovereign has no power to cut off convenient access. We know of no such rule of law. In our extensive research we have found no cases so holding nor have any been cited us. In some cases the expression is used that the sovereign holds the seashore for use by the members of the public. We think this is true but this is far from holding that grants by the sovereign of land above the seashore are impressed by implication with a reserved easement in favor of the public to furnish access by land to the shore. Nor is there in such cases such holding of the want of power in the sovereign to pass a fee simple title to the upland above the line of mean high tide.

The appellant takes the position that since their predecessors whose interest they own obtained fee simple title, Article 5415d

is unconstitutional. It says the Article violates the Texas and United States Constitutions because it violates the obligations of a contract, seeks to take private property for public purposes without just compensation and deprives it of property without due process of law. Too, it says the Act denies it equal protection of the laws and acts retroactively to deny it established defenses. We take it the last two assertions are aimed at Section 2 of the Act that creates a prima facie presumption that where property is shown to be between the line of vegetation and mean low tide the title of the littoral owners does not include the right of the owner to exclude the public from using the area for access to the sea and "there has been imposed upon the area subject to proof of easement a prescriptive right or easement in favor of the public for ingress and egress to the sea."

We find it unnecessary to pass on the assertions of unconstitutionality because in this case the appellees have resorted to the statute only insofar as it places in them the authority to bring the suit on behalf of the people and insofar as it defines the terms "beach" and "line of vegetation" as above stated. There has been no reliance on the prima facie presumption created by the Act. Apart from the presumption we think the only effect of the Act is to declare it to be the policy of the State that the public shall have the unrestricted right of ingress and egress to the State-owned beaches or such larger area extending from the line of mean low tide to the seaward side of the line of vegetation as defined in the Act *in the event* the public has acquired an easement by dedication, prescription or has retained a right by virtue or continuous right in the public. There is nothing in the Act which seeks to take rights from an owner of land. Apart from the presumption, it merely furnishes a means by which the members of the public may enforce such collective rights as they may have legally acquired by reason of dedication, prescription or which they may have retained by continuous right. It makes persons in appellees' positions representa-

tives for the people to bring suit. In the case of State v. Markle et al, 363 S.W.2d 332, (C.C.A.) we, on cursory examination of the Act, stated the above in substance. A further examination of the Act leaves us with the same view. Even if Section 2 be invalid, a matter on which we express no opinion, it would not affect the balance of the Act.

In this case the State also seeks to uphold the judgment on a basis of dedication by appellant's predecessors in title, prescription and estoppel, estoppel being based on the act of the owners in allowing expenditures of public funds in maintenance of the beach.

We are of the view that the jury's finding that the beach had been dedicated by appellant's predecessors in title is supported by sufficient evidence.

We will not detail the testimony of witnesses. The statement of facts consists of over 1900 pages and there are some 200 exhibits. In some respects the evidence is conflicting but what we state to be shown in the evidence, in our opinion, finds sufficient support in the testimony. The summary that we give of the facts will be material for the most part not only on the issue of dedication but also on the issues of prescription and estoppel.

The beach is a relatively flat and smooth, or certainly a gently sloping, stretch of sandy land running west along the Gulf of Mexico from the City of Galveston where the seawall ends to the west end of Galveston Island at San Luis Pass. In width it of course varies, but, generally speaking, from the line of mean low tide to the line of vegetation is several hundred feet. The line of mean high tide does not reach the line of vegetation or the small sand dunes that are generally just seaward of the line of vegetation. Some high tides are higher than others but the mean high tide is the average of all high tides over a lunar cycle of 18.6 years. The tides are basically the result of gravitation from the moon and to some extent the sun. There are, however, high

waters that reach to the sand dunes and the seaward side of the line of vegetation. As we understand it, the absence of vegetation is caused largely by the fact that the salty waters of the sea cover the area with frequency that suffices to prevent growth of vegetation. When we speak of high water and high tides we are not referring to height produced by storms. As a matter of fact, high waters produced by storms inundate the upland far above the vegetation line. However, these storm-produced high waters do not occur with such frequency and do not remain on the vegetation sufficiently long to destroy it or the identifiable line it forms along the beach. High water, as distinguished from high tides, is produced by a combination of high tides and climatic conditions. The winds, for instance, have substantial effect on occasion causing wave action that carries sea water to the line of vegetation. The result is that the beach seaward of the relatively small sand dunes, when the sand is relatively damp, makes a fine smooth area fitted for use as a road. Of course, a very small area in front of the dunes cannot be used for vehicular travel parallel to the seashore because of the depth of the sand. However, there are a series of dunes, not just one continuous one, so that between many of them there is suitable terrain for camping, playing, and parking vehicles. The record through testimony of witnesses and through pictures shows a well defined vegetation line along the whole of the west beach, including the particular part here involved. It is elevated a few feet above the beach. Seaward of it is sand. Immediately seaward of it in some places are small sand dunes and then the relatively flat (actually gradually sloping) sandy area suitable for vehicular travel. There is testimony that the beach and line of vegetation are stable and that this same beach and vegetation line are two hundred or more years old. This is the testimony of experts. Some laymen familiar for many years with these features, based on their observation, confirm the experts as to the stability of the beach and line of vegetation. There is testimony that while there is, particularly from storms, some erosion on the beach and at points on the vegetation line, such is temporary and the beach and the line of vegetation through the work of nature rebuild in relatively short times. The waters and winds rebuild the beach with sand and the vegetation grows from roots that are shown by the testimony not to be destroyed by storms. The vegetation line effectively marks the sandy beach from the upland which is covered by a continuous spread of vegetation inland. It marks the ending of the sandy beach almost as effectively as a bluff or fences. It makes of the sandy area seaward of it an area in the nature of a defile. Certainly it is a well identified area made by nature. Use made of the beach beyond the memory of living man is disclosed by documentary evidence, attesting to facts. Too, reputation evidence, coming through witnesses who received it from persons now deceased, throws light on the fact and nature of use.

An historical work dealing with the history of Galveston Island, written in 1916 by a Dr. J. O. Dyer, and sufficiently proven as an authoritative work, records that as early as 1836 a ferry from Galveston Island was established at San Luis Pass and there was travel on the beach from the City of Galveston to that point. An elderly witness tells of his father's having told him of a stage coach line traveling the beach. On May 23, 1838, the Congress of the Republic of Texas passed an act authorizing the Postmaster General to establish a mail route, and, from the City of Galveston to Matagorda and Texana by way of Velasco and Quintana and to immediately contract for the carriage of mail once in every two weeks. We must presume such public duty was performed. By an act of Congress dated February 8, 1840, the mail routes for the ensuing year are stated and one such route is from Quintana to Galveston by way of San Luis. From the records of Brazoria County, which county is just across San Luis Pass from the west end of Galveston Island, comes a plat

showing the plan and layout of the City of San Luis. It is dated October 1, 1841. On January 30, 1845 the Congress of the Republic of Texas established a mail route from the City of Galveston to Matagorda by way of San Luis and Velasco. From the State Archives comes a copy of the San Luis Gazette, a newspaper, dated April 13, 1841, which tells of a stage coach being operated from the City of Galveston to Velasco by way of San Luis. This news article, while not referring to the beach as such describes a very smooth surfaced road traveled and refers to the wetting of the horses' feet by the sprays of the sea. It also refers to the music of the ocean heard as one traveled. The road must necessarily have referred to travel on the beach because all other evidence shows that until the building of the Termini Road in 1956, from the 13 Mile Road, the only way to travel, except by a private road inland within fenced land, was by way of the beach. From the State Archives come various ancient maps showing a road down the Gulfward side of Galveston Island to San Luis Pass and on to Velasco, Quintana and Matagorda. All of them do not show a road from Balasco to Matagorda but do show a road from the City of Galveston down Galveston Island on the Gulfward side to the end of the Island at San Luis Pass and then on to Velasco. These maps are dated 1845, 1849, 1856, 1857, two in 1867, 1861, 1872 and 1874. The Texas Almanac of 1858 deals with travel facilities in Texas giving routes of travel, the rates per mile and states travel is by day and night along the routes. The facilities are listed as being for travel and transportation of mail. One route is from Galveston to Matagorda by way of Velasco. This would, as shown by the road appearing on the maps up to that date that are listed above, take one down the west beach on Galveston Island by way of San Luis Pass. It appears from a copy of a bond approved July 27, 1858, that A. F. Follett was granted a franchise by the County Court of Galveston County to operate a ferry from the west end of Galveston Island to San Luis Island. There is given a schedule of rates to be charged showing different rates for pedestrians, horse and buggy, two horse carriage, led horse, and four horse wagon or stage.

The above is, so far as we recall, all of the evidence bearing on use of the beach prior to the memory of living witnesses.

The area here involved is west of what is popularly called "13 Mile Road." This is the road running 13 miles west of the Court House. It ran from the City of Galveston west down the approximate center of the Island until it took a turn down to West Beach at the 13 mile point. It was the only road by which one could travel west on the Island unless one traveled the entire length west along the beach. Under all testimony this situation existed until the Termini Road was completed from the 13 mile point to San Luis Pass in 1956. While there seems to have been travel the entire length of the west beach, much of it commenced on the beach at the 13 Mile Road. People would drive out that road from the City to the beach and then proceed west along the beach.

Trial of the case was in April, 1961. We will not specifically notice all witnesses' testimony, but we do want to especially notice the testimony of the older ones. One such witness was a Mr. Cordray, a retired pharmacist, who had lived in Galveston all his life. He was 82 years old at the time of his testimony. He was born in 1879. He, when a boy, went down the beach all the way to San Luis. All through the years there has been use of the beach. He saw people driving and they would use the beach all the way from the water line to the line of vegetation. During the years before the advent of automobiles people went with horses and buggies. There was travel all the way down the beach to San Luis. When automobiles came in people would drive these vehicles down the beach. He would see many people driving, swimming and fishing. He would see people fishing in the waters and camping on the beach. Those camping and fishing and swimming would pull their vehicles up between the sand dunes

to the vegetation line. The people would drive down near the water most of the time. He never asked permission from anyone to make use of the beach. No one ever tried to stop him from using it. He figured he had a right to use it. This type of use had continued to his knowledge ever since he was a boy. There was a life guard station near San Luis. He and other people used to go down there. The only way to get there west of the 13 mile point without going over a private road through fenced pastures was to ride down the beach. The private road is what is sometimes called the "Ridge Road." It was up on the ridge above the seaward side of the vegetation line. It had gates at dividing fences and you had to get the owners' permission to use it. There was a ferry at the end of the Island. Old-timers, now deceased, told him of the operation of a stage line in the past though he was not told just when it operated. He was told the stage carried mail and passengers. His father who came to Galveston in 1837 and who died there in the 1890's, was one person who told him of the stage line.

Another elderly witness was Mr. Cheesborough, who, at the time he gave his deposition shortly before trial, was 93 years old. He was born July 17, 1867 in Houston. His family moved to Galveston about 1875. He has lived in Galveston since that time. He is Secretary-Treasurer of the Galveston Terminal Railroad Company and has been for 60 years. He was asked about all the West Beach west of the 13 Mile Road. He used to drive a horse and buggy down before the time of automobiles. He went to the end of the Island on occasion. There was a lifesaving station at the end of the Island. He went down there many times. He saw many people bathing and fishing. He never spent the night. He would make the trip in one day. He has seen a great many people drive down, particularly on the weekends. Some would put up tents on Saturday afternoon and stay until 5 o'clock on Sunday afternoon. The beach was free of fences the entire length. The people used it for many years. He knows there were no fences across the beach drive because he traveled it many years. Fences were up on the "grass" line and cattle grazed up there. This stopped cattle from going to the beach. "No one would dream any such thing as to block the driveway * * * and the driveway was in use, I am satisfied, at least more than a hundred years ago." The Blum Land Company, for which he worked, owned land down there. He used to take his family down there on picnics. He saw many others doing the same.

There were numerous other witnesses for appellees but their testimony covers the period from about 1919 to the date of trial. From their testimony we learn that they were just ordinary members of the general public from Galveston and Houston who gained their knowledge concerning use of the beach from use they and their families made of it and from observing use made of it by the public generally. The effect of their testimony is that general use of the beach west of the 13 Mile Road was made by them and others as members of the public. People used the beach from the water line to the sand dunes to drive to the west end of the Island and return. While it is true that they generally drove near the water where the sand was packed the height of the water varied from time to time so the sand would be packed nearer the line of vegetation and thus people would drive along the waters near the sand dunes. Some witnesses testified there was a "low road" and a "high road". When the tide produced high waters on part of the beach, travel was up near the sand dunes. Of course, there was at least one high tide a day and usually there were two high tides. Too, the evidence reflects some high tides were and are higher than others. In addition there are high waters which are the result of tide and winds. This situation would require and permit travel up above the line of mean high tide. The waters would pack the sand, from time to time, up to the sand dunes. Travel on the beach west of the 13 Mile Road, was, of course, heavier on weekends and holidays and particularly during the summer months

and the springtime. Too, the farther west one goes the more sparse he will find travel and other use. There is sufficient evidence also to show that each year, particularly in the summer months, in the springtime, and on holidays and weekends, the members of the public generally parked their automobiles, since the advent of automobiles, at various places on West Beach and personally went into the water to fish and swim. They also played at various places on the beach up to the line of vegetation. Also there was overnight camping and tents were pitched at various places on the beach even up between the sand dunes to the line of vegetation. Automobiles were parked up toward the sand dunes and between them on occasions so the people and their property would be safe from high tides and high water. In the wintertime there would be much less fishing, but there would be some fishing even then. We do not recall there is evidence of swimming in the wintertime, but it is a matter of common knowledge that climatic conditions are certainly suitable for swimming in the Gulf waters for six months of the year. Too, we would note the evidence shows the beach is more heavily used east from the 13 Mile Road to the City Limits. The evidence may be accurately characterized as showing yearly, continuous and indiscriminate use by members of the general public, when they chose to do so, for the purposes above described with the members of the general public seeking no permission from the landowners or anyone else. Too, the record is devoid of any instance of the requirement of permission by any of the owners of the land or their representatives. All of appellees' witnesses testified they asked permission of no one and assumed they had a right to make the use of the beach that they did and never heard of anyone being required to obtain permission. The truth of the matter is that the use of the West Beach by the public generally for travel, for camping, for use in connection with swimming and fishing and picnicking has been so prevalent since the widespread use of automobiles, in about 1920, as to almost be the subject of judicial notice.

There is some evidence that along with the general public some of the property owners used their respective tracts to the line of mean high tide and allowed their friends to use it so they could swim and fish. Too, since there was no public road west of the 13 Mile Road property owners would get to their respective tracts by driving along the beach although for many years there was the private road we previously mentioned running inland of the seaward edge of the line of vegetation. Land owners, as to the ridge road, allowed one another keys to open gates in the dividing fences. Too, there was testimony that land owners or their lessees sometimes drove cattle along the beach into town. This does not seem to have been very frequent. There is evidence that the fences paralleling the beach for the most part have been above the seaward side of the line of vegetation though some of them were at times just forward at the sand dunes. As to Section 12, as we recall, they were above the vegetation line. Also, there is in evidence that in the early part of this century openings would be available in the fences along the vegetation line so cattle of the owners or lessees who had them pastured west of the 13 Mile Road could be let out on the beach and into the water when the mosquitoes were bad. Some little evidence indicates in the early part of this century there were no fences in many places keeping the cattle from the beach. In this connection particularly it is observed that, with the exception of one short period ending in 1915, there is absolutely no evidence of any fence being built seaward of the sand dunes crossing the beach so as to interfere with use by the public as above described. One witness testified while he was a boy there was one fence across the beach, we believe at Section 11, that was there from 1911 to 1915. He did not know how long it had been there prior to 1911. It had an unlocked gate in it to permit passage along the beach. This fence was destroyed in the 1915 storm and was not rebuilt. There was

some evidence that fences were built back of the seaward side of the line of vegetation because this would place them on a ridge above every type of high water except storm waters. Except for the one fence across the beach, as above stated, there has never, so far as the evidence shows, been anything such as the barriers erected in about 1958 to interfere with use of the beach.

Evidence was introduced showing expenditures by Galveston County of some $82,000.-00 from 1929 to the date of trial for maintenance of beaches. There is no showing as to what amount was spent on any particular part of any particular beach. However, there is testimony by county employees of work done over this period of time to keep all beaches, including West Beach all the way to San Luis Pass, open so it could be used for travel and free of debris left by users of the beach. Logs that came up on the beach and lodged were removed. Many such logs were pushed up into the area between the sand dunes next to the line of vegetation and left to be used by campers as firewood. Evidence showed patrolling of the beach by traffic officers and the issuance of traffic tickets to speeders. When we refer to maintenance, we do not mean the County graded the road or placed shell, gravel or other surfacing materials. They did not. If there were washouts, they would be repaired by filling in with beach material. Actually, the usual surfacing materials would have been useless because they would soon have washed away. The action of the tides and other high waters makes a natural smooth surface ideal for travel. After the daily waters have covered the area, evidence of travel is obliterated temporarily but use again temporarily shows vehicle tracks.

The witnesses for appellant really confirm the uses of West Beach as testified to by appellees' witnesses and particularly along Section 12. It is true that some of them, particularly one of the owners of an interest in Section 11, Mr. Sealy Hutchings, testified the land owners permitted the members of the public to use the beach, thus seeking to establish permissive use. It is significant, however, there is no instance shown where any member of the public actually asked for permission or where the use by a member of the public was interfered with by a land owner.

The official maps of the Texas Highway Department of 1936 and 1952, showing roads available for travel, show a road down West Beach. The Galveston Business League, in 1909, published a "Visitors Guide to Galveston". It shows there were 20,000 copies published. At two places in it reference is made to the availability for travel of 30 miles of smooth, hard and level beach. While West Beach is not specifically mentioned, the mileage given necessarily includes West Beach.

We would note that appellant complained of testimony that involved use of the whole West Beach when only the area along Section 12 was involved in this case. Testimony concerning use of the beach from the City of Galveston and the 13 Mile Road to San Luis Pass and on to Velasco by way of the ferry necessarily established use for purposes of a road across the area seaward from the vegetation line at Section 12. Too, with regard to fishing, camping and swimming, while much of it could and did take place at other areas on the beach, the general activity of the public in these areas was carried on indiscriminately all the way to San Luis Pass so as to give notice of the nature of the public's claim as to those times they are shown to have made such use of the area seaward of Section 12. Much of appellant's testimony also involved the whole length of the beach.

We hold that under all the evidence an implied common law dedication by appellant's predecessors in title is shown of the area seaward from the seaward side of the line of vegetation to the line of mean high tide.

It is well established in this State that there may be a dedication of land to public use. Implied dedication

need not be shown by deed nor need public use be shown for any particular length of time. It is sufficient if the record shows unequivocal acts or declarations of the land owner, dedicating the same to public use, and where others act on the faith of such dedication, the land owner will be estopped to deny the dedication, or make any future use of the property inconsistent with any purpose for which the land was dedicated. It is of course necessary that there should be an appropriation of the land by the owner to public use. By this last statement is meant the land owner must be shown to intend to dedicate the land to public use. In the case of implied dedication this intent is not, or at least need not be, manifested by an expression to that effect, but may be manifested, and usually is, by some act or course of conduct. Oswald v. Grenet, 22 Tex. 94; Owens v. Hockett, 151 Tex. 503, 251 S.W.2d 957 (S.Ct.); Dunn v. Deussen, 268 S.W.2d 266 (C.C.A.), ref., n. r. e.; O'Connor v. Gragg, 161 Tex. 273, 339 S.W.2d 878 (S.Ct.); Compton v. Waco Bridge Co., 62 Tex. 715; Chambers County v. Frost, 356 S.W.2d 470 (C. C.A.), ref., n. r. e. The intent on the part of the owner, however, is not a secret intent, but is that expressed by visible conduct and open acts of the owner. If the open and known acts are of such a nature as to induce the belief that the owner intended to dedicate the way to the public and individuals act on such conduct, proceed as if there had been in fact a dedication and acquire rights that would be lost if the owner were allowed to reclaim the land, then the law will not permit him to assert that there was no intent to dedicate, no matter what may have been his secret intent. The act of throwing open property to the public use, without any other formality, is sufficient to establish the fact of dedication to the public; and if individuals, in consequence of this act, become interested to have it continue so, the owner cannot resume it. Owens v. Hockett, supra.

The evidence we have detailed shows the owners, beginning with the original ones, have thrown open the beach to public use and it has remained open for over a hundred years. There is absolutely no evidence of closing it to public use until the erection of the barriers complained of in this case. They were erected in 1958. There is the evidence of one fence, which we spoke of above, that was there from about 1911 to 1915, down the beach some distance from appellant's property. However, it had an unlocked gate permitting passage by users. While the exact location of the fences lateral to the beach is shrouded in some uncertainty, it seems clear that they are up above the seaward side of the line of vegetation at Section 12 most of the time. Appellant's explanation of this is they were there to prevent destruction from high waters. This is a possible and likely explanation. However, if the various prior owners did not intend to dedicate the beach, they could easily have done as has been done in the erection of the present barriers. They could have erected barriers of such construction that at most they would have been damaged or destroyed by storms and then repaired or replaced at relatively small expense. Such would have been evidence of the absence of intent to dedicate. Or, as has been true in some decided cases, they could have erected signs showing use by the public was purely permissive. Rather than any such conduct, however, successive owners have, without any protest, allowed members of the public generally to use the beach each year. While it is true there were few who used it during the winter months, the thing of significance is that whoever wanted to use it did so continuously for these many years when they wished to do so without asking permission and without protest from the land owners. Too, the County expended funds on the beaches, including West Beach, from 1929 to the erection of the barriers, keeping debris cleared so the beach could be used by the public. It was so open the owners must have known of it. Too,

the patrolling of the beach by law enforcement officers was carried on openly and for such length of time the owners should have known of it, and it is the duty and right of officers to patrol only public roads in the enforcement of the law. In this connection, it is interesting to note that in the case of Brown v. State, 163 Tex. Cr.R. 170, 289 S.W.2d 942, our Court of Criminal Appeals, on much less evidence, found West Beach to be a public road. This maintenance and patrolling is some evidence of intent to dedicate. Chambers County v. Frost, 356 S.W.2d 470 (C.C.A.), ref., n. r. e.

Appellant urges that the owners also used the beach. This alone is not fatal to a finding on implied dedication. O'Connor v. Gragg, supra. It would seem to us this would be but evidentiary and the weight to be given such use by the owner would depend on its nature, extent and all surrounding circumstances. The use by owners shown is small as compared to use made by the public without permission from the owners. Too, the members of the public were not confined to residents of the community. Hunting shown to have been done was on the Bay side, not on the Gulf side. When their cattle were let out so they could get away from mosquitoes, they were not confined within their owner's land because there were no fences to confine them within the limits of their owner's lands, but they could wander at will up and down the beach on others' lands. It was like turning them out on a "Common". Too, the owners, when they used their part of the beach to drive cattle, were using it as only a link in the beach road that led to the City of Galveston. They could be said to be using it, not in exercise of a right of ownership, but as a member of the public.

For there to be a dedication there must be acceptance by the public. The evidence above detailed shows acceptance by the public. Compton v. Waco Bridge Co., supra; City of Tyler v. Smith County, 151 Tex. 80, 246 S.W.2d 601 (S.Ct.).

In reaching our conclusion that there is evidence of probative value to support the jury's finding of dedication, we have viewed the evidence most favorably to the jury's finding and, in concluding that such finding is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong, we have weighed all of the evidence, though we have not specifically noticed all of it in this opinion. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (S.Ct.).

Appellant urges there is no showing of authority on the part of the owners to dedicate, suggesting they may have labored under some disability. This contention is erroneous under the facts of this case. Martin v. Burr, 111 Tex. 57, 228 S.W. 543 (S.Ct.); Dortch v. Sherman County, 212 S.W.2d 1018 (C.C.A.), no writ hist.; Dunn v. Deussen, supra.

Appellant urges there can be no dedication because there has been no acceptance by Galveston County as required by Article 6626, V.A.T.S.

Article 6626 applies to express dedication only. It has been held that for there to be an implied dedication acceptance by public authority is not necessary. User by the public generally suffices. Dunn v. Deussen, supra.

We are also of the view that the jury's finding of an easement by prescription finds evidence to support it and such evidence is sufficient.

An easement by prescription may be created by user. Such user must be adverse to the owner, must be continuous and must be for at least 10 years. Expressed otherwise, the user must be under a claim of right in the users and not a permissive use under the owner and must continue for the requisite period of time. We think the above facts clearly show continuous user for the purposes above discussed for far more than the 10 year period required.

Appellant, while contending there was not even sufficient user, particularly contends the user was not adverse because the owner used the property at the same time it was being used by members of the public. As we understand the law, use by the owners and others at the same time raises the presumption that user by others is permissive only but there may be present in a given case sufficient evidence to show user by the others under a claim of right. Mere joint use is not determinative. If the nature of the use is such as to show to the owner that the users are claiming under a right independent of any permission from him, there is the requisite adverseness. The jury found there was not permissive use. Chambers County v. Frost, supra; Fowler v. Matthews, 204 S.W.2d 80 (C.C.A.), no writ hist. In this connection we will not notice all cases cited by appellant, but we do note two Supreme Court decisions. O'Connor v. Gragg, supra, and Othen v. Rosier, 148 Tex. 485, 226 S.W.2d 622. In these cases the Court held that under all facts there was not shown to be an adverse use and one of those facts was joint use by the owner and his neighbors in the community of a strip of the owner's land lying wholly within the boundaries of his ownership. As stated by the Court in the O'Connor v. Gragg case there was there no evidence tending to show a claim of right by Gragg or the public to use the road to the exclusion of the owner. This statement leads us to the conclusion that the mere joint use is not destructive of a conclusion of adverseness if there are other facts present to show use by others is under a claim of right in themselves. In the cited cases and others relied on by appellant, and others we have read, the land on which the easement was claimed lay wholly within the owner's boundaries. Here appellant's property is but a small link in a road used by the public generally. It was not a strip by itself forming the entire road traveled from the claimant's property solely across appellant's property to reach a public road. It was but one link in a way also used across other persons' lands to go to and fro from the 13 Mile Road and in many instances on to the City of Galveston and San Luis. It could under such circumstances be said the owner's use was not in his right as owner but as a member of the public. Use for a road has been going on, as shown by the evidence, ever since before the time of the patent. The use by appellant's predecessors in title in turning their cattle out on the beach is of the same character as use of the road. It can reasonably be said, under the facts of this case, they were turned out into a commons and use in this fashion by the owner was not in assertion of rights of ownership, but in assertion of a right as a member of the public to use the beach. When the cattle were on the beach they were not confined to the owner's land but could roam at will up and down the beach. Further in this case the persons who used the beach were not merely neighbors of the owners, nor were they merely persons in the community, as was true in the cases relied on by appellant. As shown by the evidence, the persons who have used the beach from the beginning have been residents of Galveston and elsewhere in the State. Many witnesses who testified were from Houston. Thousands of people were shown to have used the beach, not only for a drive but for camping and in connection with fishing, boating and swimming. Evidence shows they used it at will without asking permission and there is no evidence of any objection by owners. By public laws routes for travel along the beach were, as above shown, established. Too, public advertising showed the availability of the beach to the public. In addition, patrol of the beach by law enforcement officers is shown. Further, whatever maintenance of the beach has been necessary, since 1929, has been done by employees of Galveston County and public funds have been expended for the purpose. All of these facts, we think sufficient to show the adverse nature of the use by the public.

The nearest cases to our factual situation are Fowler v. Matthews, supra, and Chambers County v. Frost, supra. While we feel the facts in those cases were stronger in support of appellees' position than the facts of this case, we nevertheless feel the facts here are sufficient.

Appellant also asserts in effect the evidence does not show what part of the beach was used and to establish an easement by prescription the same route, in case of a road, must be used. We think the evidence shows, as we have above detailed, the whole of the beach from the line of mean low tide to the sand dunes has been used for actual travel and in between the dunes to the vegetation line has been used in connection with travel such as for parking vehicles and for camping and in connection with fishing and swimming done by those who traveled. As above noticed, this has not been a desultory use as is the case in those cases relied on by appellant. It has not been a use across an open prairie where one travels helter-skelter. Nor has it been travel where for some time one travels on a given route and later travels another route distantly removed from the first route. The physical nature of the beach and the use made definitely define the route. The line of vegetation and the line of low tide mark the route. Since the high tides are daily throughout the year, it means that anyone making use of the beach at high tide must use that part near the vegetation line. Evidence shows daily systematic use of the whole area. This requirement of a definite route is required so the owner may have notice of not only the fact of adverse claim but the extent of it. The nature of the terrain and the use made gave sufficient notice to the owner of the extent and location of the route claimed. The case of Hall v. City of Austin, 20 Tex.Civ.App. 59, 48 S.W. 53 (C.C.A.), certified on other points, 93 Tex. 591, 57 S.W. 563, is very much in point. There the pass through the hills defined the route. Here the line of mean low tide and the line of vegetation, two of nature's monuments, effectively mark the route used.

■ Appellant also contends the beach has changed and there has been erosion so different land has been used from time to time. There is evidence to that effect. There is sufficient evidence to the contrary to support the jury's finding of no net erosion and the beach is the same as ever. Too, though under appellant's evidence the beach is narrower, we think the evidence clearly shows the line of vegetation has remained the same for at least 200 years. Experts testified the beach and the line of vegetation are stable ones.

■ The description of the boundaries of the easement is not void for indefiniteness. Its location is given as the area between mean low tide and the line of vegetation. We judicially know that surveyors can determine the line of mean low tide. The line of vegetation is a well defined physical feature located upon the ground. Its stability is shown by the testimony. A surveyor can go upon the ground and locate the area stated in the court's judgment. The boundaries are natural monuments and as calls in a description of land are of the highest dignity. See Luttes v. State, 159 Tex. 500, 324 S.W. 2d 167 (S.Ct.); Stafford v. King, 30 Tex. 257.

■ We will not specifically notice each complaint made by appellant of the action of the court in admitting evidence. It will suffice to note that complaint was made of the offer by appellees of the various ancient maps, hearsay about the use of the beach by a stage line, the history of its use by a stage line, the license to operate the ferry at San Luis Pass, the San Luis Newspaper of 1841, the 1858 issue of the Texas Almanac, and the Congressional Acts showing establishment of mail routes. We hold they were all admissible. Reputation concerning a matter of public interest, when the reputation is

of a past generation, is admissible. Cox v. State, 41 Tex. 1, Iola State Bank v. Mosley, 259 S.W. 227 (C.C.A.), writ ref.; Rice v. Melott, 32 Tex.Civ.App. 426, 74 S.W. 935 (C.C.A.), writ ref.; Jordan v. Parsons, 239 Mo.App. 766, 199 S.W.2d 881 (St. Louis Ct. of App. Mo.); Borden v. Town of Westport, 112 Conn. 152, 151 A. 512 (Conn.); McCormick and Ray, Texas Law of Evidence, 2d Ed., Sec. 1322. Ancient maps are competent to show early use of land for road purposes. Yturria Town and Improvement Co. v. Hidalgo County, 125 S.W.2d 1092 (C.C.A.), no writ hist.; McCormick and Ray, Texas Law of Evidence, 2d Ed., Sec. 1322. These maps are ancient instruments and came from the Archives of the General Land Office, the State Library or the University of Texas Library. They covered the whole Gulf Coast of Texas and each showed a road down the Gulfward side of Galveston Island. The official highway maps of the Highway Department of 1936 and 1952, showing a road available for travel down the West Beach were admissible to show notoriety of use. The 1841 issue of the San Luis Advocate and the 1841 plat of the Town of San Luis were admissible because they furnish information corroborating and showing early use of West Beach by the public as a road. Dyer's History was admissible as relating to a matter of general interest of a past generation. It showed use of West Beach as a stage coach route. Allen v. Halsted, 39 Tex.Civ.App. 324, 87 S.W. 754 (C.C.A.), writ ref. The 1858 issue of the Texas Almanac showing a route for travel from Galveston by way of Velasco to Matagorda was admissible. It corroborated other evidence of the early use of West Beach as a road. It is widely recognized as an authoritative publication dealing with facts relating to Texas. Western Union Tel. Co. v. Gilliland, 61 Tex.Civ.App. 185, 130 S.W. 212 (C.C.A.), writ ref. The advertisement in the pamphlet of the Galveston Business League of 1909 was admissible as showing the notoriety of use made of all the Galveston beaches.

The other items of evidence which we may not have specifically noticed are in our opinion admissible but if they were not, their admission was not such, in the light of the whole record, as was calculated to cause or probably did cause the rendition of an improper judgment.

All points have been considered by us and though some have not been specifically discussed, they are overruled as being without merit.

We affirm the judgment of the trial court on the ground that an easement has been established as found by the jury, by dedication by appellant's predecessors in title and prescription.